2022 IL App (2d) 210510-U
No. 2-21-0510
Order filed November 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| 166 SYMPHONY WAY, LLC and THE HAIGHT COMPANY, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellees/Cross-Appellants, | ) ) | |
| v. | ) ) | No. 18-CH-72 |
| U.S. PROPERTY INVESTMENTS GROUP, LLC, | ) ) ) | Honorable Kevin T. Busch, |
| Defendant-Appellant/Cross-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's findings preserving the easement. We reverse and remand as to attorney fees. Affirmed in part; reversed and remanded in part.

¶ 2    In 1987, plaintiffs, 166 Symphony Way and The Haight Company (collectively referred to as HC) entered into a land swap and easement agreement with the former owners of the neighboring property now owned by defendant, U.S. Property Investment Group, LLC (USP). The easement ran with the land. HC, the dominant tenant, would have access to a 20-foot-wide lane running along the eastern wall of its building such that HC could, among other things, access its

delivery door. In 2014, USP purchased the neighboring property and became the owner of the servient estate. The parties soon began to disagree as to the proper use of the easement. HC's position was that it used the easement as it always had, and USP was looking for any reason to terminate the easement. USP's position was that HC, coincidently, increased its use of the easement due to the wedding business that it had started simultaneously to USP's purchase.

¶ 3    HC filed a four-count complaint in chancery court. HC sought the removal of barriers placed by USP over a curb cut that HC used to access the easement (count I). HC also sought the withdrawal of USP's recordings of termination of the easement, which USP had filed based on its belief that HC had violated paragraphs 8 (concerning insurance), 6(a) (concerning blocking the easement), and 6(b) (concerning misuse of the easement so as to constitute a nuisance or violation of law or ordinance) of the written easement agreement (counts II and III). HC asked that the court eliminate the apparent discretion afforded to USP in paragraph 7 of the easement agreement to unilaterally terminate the easement. Last, HC alleged a prescriptive easement over a curb cut, which it used to access the easement.

¶ 4    USP filed a counter-complaint, pleading three counts for declaratory judgment of termination, based on allegations HC had violated paragraphs 8, 6(a), and 6(b). In the alternative, it pleaded breach of contract, again alleging HC had violated paragraphs 8, 6(a), and 6(b).

¶ 5    The trial court conducted a bench trial and ruled in favor of HC, with some qualifications. It determined that there had been no material breach of paragraphs 8, 6(a), and 6(b) and declared all recordings of termination null and void. It also ordered that USP remove barriers to accessing the easement from the curb cut, but in a manner different to that requested by HC. The court determined that HC had the right to access the easement over the curb cut, because access in that manner had been contemplated by the original parties to the agreement. The court stated that, in

the alternative, if the original parties had not contemplated the right to access the easement over the curb cut, that right had been acquired by prescriptive easement. The court also ordered that, moving forward, USP could not make a unilateral decision that the easement had been terminated and would, instead, need to obtain the written agreement of the parties or a court order. Finally, in addressing attorney fees, the court referenced both the agreement's fee-shifting provision and its indemnification clause in determining that, in effect, each party pay its own fees.

¶ 6 USP appeals, challenging the trial court's findings in relation to preserving the easement. HC cross-appeals, arguing that the trial court erred in not awarding it attorney fees. For the reasons that follow, we affirm the trial court's ruling preserving the easement, and reverse and remand as to the question of attorney fees. Affirmed in part; reversed and remanded in part.

¶ 7                                    I. BACKGROUND

¶ 8 Plaintiffs, referred to collectively as HC, include: (1) 166 Symphony Way, LLC, the sole owner of which is Linda Haight, and which owns the 166 Symphony building; and (2) The Haight Company, the owners of which are Linda's adult children, Doree Haight, John Haight, and Kari Goodmay, and which leases some but not all of the space in the 166 Symphony building. Defendant, USP, the owners of which are Bogdan and Sandra Stanek, purchased the real estate located at 220 Spring Street in April 2014. A portion of the 220 Spring property is subject to a 1987 easement agreement.

¶ 9                          A. The 1987 Written Easement Agreement

¶ 10 The relevant terms of the 1987 Written Easement Agreement are as follows. Paragraph 2(a) defines the easement as a driveway easement, and provides:

> "(a) 'Driveway Easement' shall mean the non-exclusive right and easement, exercisable in common with all others having like right, including [Grantor's successor,

USP] *** at all times without fee or charge; to pass and repass, *with or without a vehicle of any description*, over and along Parcel C [the 20-foot-wide lane running alongside the 166 Symphony building] *for driveway purposes and for the purpose of access, ingress and egress to and from Parcel B* [the 166 Symphony building] to the public right-of-ways ***; provided, however, that such easement rights may be exercised only for such purposes as are reasonably associated with or incidental to the lawful use of Parcel B [the 166 Symphony building]."  (Emphases added.)

¶ 11    Paragraph 3 provides in part that the Grantor's successors [USP] have

"the right to relocate said Driveway Easement to such other locations on Parcel A [the remainder of USP's parking lot that is not already part of the easement] as Grantor [or its successor] may determine providing that such relocation does not materially deprive Grantee [HC] of access to the Entry Doors."

¶ 12    Paragraph 6 further restricts use of the easement as follows:

"<u>6. Restriction on Use of Driveway Easement</u>. *** [N]either Grantee nor Grantee's Permitted Users shall make use of Parcel C in such a way as to:

(a) Block, impede, or impair the use of Parcel C by Grantor or Grantor's authorized agents, or use said Parcel C for the storage of any property; or

(b) Create any public or private nuisance or violate any laws, ordinances, or regulations of any applicable governmental body, or otherwise injure the reputation of Parcel A or Parcel C."

¶ 13    Paragraph 7 addresses the Grantor's rights in the event of a breach:

"<u>7. Breach</u>.

(a) In the event of a breach of any of the provisions hereof by Grantee or its

Permitted Users, which breach is not cured within 7 days following written notice thereof by the Grantor to the Grantee, or immediately upon the giving by the Grantor to the Grantee of the third notice in any consecutive twelve (12) month period of the occurrence of a breach hereof by Grantee, Grantor shall have the right, at its election to:

(i) Terminate the rights of Grantee hereunder by recording a declaration of such termination with the office of the Recorder of Deeds of Kane County, Illinois; or

(ii) Procure an order from any court of competent jurisdiction awarding Grantor damages incurred by reason of such breach and/or enjoining Grantee from any further breach of this Agreement."

¶ 14 Paragraph 8 addresses indemnification and requires that the Grantee name the Grantor as an additional insured:

"8. Indemnification. Grantees for itself and its successors and assigns (collectively the 'Indemnitors') does hereby agree to forever indemnify, defend, and hold Grantor, Grantor's heirs, successors and assigns (collectively the 'Indemnitees') harmless from and against any and all liability and expense (including reasonable attorney's fees) incurred by Indemnitees and arising out of or in connection with any claim, demand, suit, or other action for any injury, loss or damage alleged to have occurred as a result of or arising in connection with the use or enjoyment by Grantee or Grantee's Permitted Users of a Driveway Easement on Parcel C. Grantee shall at all times maintain with a reputable insurance company licensed to do business in the State of Illinois a policy or policies of insurance insuring against liability for personal injury or property damage having a

combined single limit of $1,000,000: *such policy of insurance shall expressly name indemnitees as additional insureds and proof thereof (and of all renewals thereof) shall be deposited with indemnitees*." (Emphases added.)

¶ 15    Finally, paragraph 9(c) sets forth a fee-shifting provision:

"(c) in any action or proceeding between the parties arising out of or in connection with this Agreement or the breach or enforcement thereof, the party prevailing in such proceeding shall be entitled to recover his/its costs and expenses (including *reasonable* attorney fees) from the non-prevailing party." (Emphasis added.)

¶ 16                           B. Physical Description of the Easement

¶ 17    With these terms in mind, we describe the physical space at issue. The front door of HC's building (166 Symphony Way) faces south and opens onto Symphony Way. HC's building is long and narrow. The front door of USP's building (220 Spring) faces east and opens onto Spring Street. USP's building is L-shaped, with the western-most wall directly abutting a portion of HC's building's east wall. The result is a U-shaped open space facing Symphony Way. USP owns the entirety of the opening.

¶ 18    However, this U-shaped opening contains an easement which runs alongside HC's building on its east wall. The easement is 20 feet wide. HC's building has a delivery door on the east wall, at approximately the mid-point of the wall, and vehicles access the delivery door via the easement. There is a freight elevator on the other side of the delivery door.

¶ 19    The parties refer to HC's building as Parcel B. They refer to the easement as Parcel C. They refer to the remainder of the opening as Parcel A.

¶ 20    There are obstacles to entering the easement straight on from Symphony Way. Looking into the opening from Symphony Way, there is a curb and sidewalk directly in front of the 20-foot

easement. Additionally, there is a utility pole located just at the western edge of the easement. A few feet east of that, there is a village lamppost. However, a few feet east of the lamppost there is a curb cut, allowing for easy access into the opening. Historically, HC's vehicles entered the easement from the curb cut, even though the curb cut was located to the east of the easement. Vehicles entering from the curb cut would then drive over to the easement, without lingering in Parcel A (aside for a few outlying instances, to be discussed below).

¶ 21    HC and USP dispute just how difficult it is for a vehicle to enter over the curb and sidewalk directly into the 20-foot easement. USP maintains that it is not difficult, whereas HC maintains that it is. HC would like to preserve the 20-foot easement alongside the east wall and access it over the cub cut. It urges that use of the curb cut, though not mentioned in the easement agreement, was contemplated by original parties to the agreement. In the alternative, it urges, as set forth in count IV of its complaint, that it has acquired use of the curb cut by prescriptive easement.

¶ 22                    C. Notice and Pleadings

¶ 23    The Staneks' displeasure with HC's use of the easement began immediately upon their purchase in 2014. From 2014 to 2016 Sandra Stanek sent HC at least 10 notice letters, telling HC not to park or place construction material, such as drywall, in the easement. On December 20, 2017, pursuant to paragraph 8 of the easement agreement, Sandra sent a notice letter informing HC that USP had not received proof that HC maintained insurance naming USP as an additional insured. On January 5, 2018, pursuant to paragraph 7, USP recorded a termination of the easement based on its belief that HC had violated paragraph 8. The January 5, 2018, recording also referenced HC's parking practices (later characterized as delivery trucks idling in the easement while they dropped off goods at the delivery door) which purportedly violated the easement agreement (though USP failed to reference paragraph 6(a) by number). USP asserted that these

violations constituted a material breach of the agreement.

¶ 24    In June 2018 and the months that followed, Sandra sent at least nine notice letters complaining of violations of 6(b) in that HC's guests misused the easement as a place to perform photoshoots and engaged in lewd behavior such as urination and vomiting. On November 27, 2018, with guests continuing to urinate and vomit in the easement and parking lot area, Sandra recorded a second termination of easement.

¶ 25    On May 2, 2019, HC filed the operative complaint in chancery court. HC pleaded four counts. In counts II and III, HC sought, *inter alia*, to have USP's January 2018 and November 2018 recordings of termination declared null and void. It argued that it did not materially breach paragraphs 8, 6(a), and 6(b) so as to warrant the termination of the easement. Further, it asked the court to read paragraph 7 in a manner so as to prevent USP from unilaterally terminating the easement at its whim.

¶ 26    In counts I and IV, HC sought continued use of the curb cut to access the easement. In count I, HC pleaded that USP had a duty to allow it to access the easement and, by putting up a fence (and other obstacles) along the curb cut, USP had blocked HC's safe and reasonable access to the easement. In count IV, HC pleaded that its actions, as well as the actions of its vendors and customers, in using the curb cut to access the easement, "were 'adverse' insofar as they were undertaken without authority for the same being given by [USP's predecessors] *** [and] in an uninterrupted [manner] for over 20 years." Though not expressly stated, count IV is, in a sense, an alternative to count I. That is, if the easement agreement did not contemplate that HC would use the curb cut to access the easement, if the successive owners of 220 Spring never granted HC permission to do so, and if HC simply acted, in an open and uninterrupted manner, in accordance with its one-sided belief that it had a right to do so, then HC had acquired a prescriptive easement.

¶ 27    On March 6, 2020, USP filed a counter-complaint, pleading three counts for declaratory judgment of termination, based on allegations HC had violated paragraphs 8, 6(a), and 6(b).  In the alternative, it pleaded breach of contract, again alleging HC had violated paragraphs 8, 6(a), and 6(b).

¶ 28    On February 25, 2020, while the lawsuit was pending, USP recorded its third termination. The document acknowledged that the January 5, 2018, and November 27, 2018, terminations were the subject of a lawsuit filed by HC.  As such, to the extent that those terminations were invalid, USP purported in the February document to terminate the easement due to alleged violations of paragraph 6(b) (concerning misuse of the easement so as to constitute a nuisance or violation of law or ordinance).  According to USP, HC used the easement in violation of section 4.14.2 of the Americans with Disabilities Act (ADA), 42 U.S.C. §12102, Accessibility Guidelines for Buildings and Facilities (Appendix A to Part 1191, section 4.12.2) (providing that a "service entrance shall not be the sole [ADA] accessible entrance unless it is the only entrance to the building or facility"). As will be discussed below, the trial court would determine that HC's ADA compliance was not relevant to an alleged misuse of the easement under paragraph 6(b).

¶ 29    On April 20, 2021, USP filed a fourth recording of termination, alleging a violation of the Fire Code.  USP was apparently concerned that fire trucks would not have adequate access to the sprinkler system from the easement.  USP filed the document after discovery in the case was closed and just days before testimony was to begin.  The trial court learned about the fourth termination in a round-about way, after testimony in the case had nearly concluded.  USP informed the court that it sought to bar certain evidence from HC.  That evidence included testimony or a report from the fire chief, which HC expected to provide that HC was not, in fact, in violation of the Fire Code. USP argued that the Fire Code violation was not relevant to the instant case.  Instead, it had

recorded the termination in the event that it was not successful in the instant suit. HC argued that USP's very act of recording the fourth termination demonstrated that USP would continue to file frivolous recordings of termination absent a requirement that it first obtain a court order before filing a recording of termination. The trial court agreed that USP's act of recording the fourth termination was relevant to the question of USP's good faith or lack thereof: "I share [HC's] dismay a little bit because I disagree with [USP] that this is not an issue before this court. One of the primary allegations [HC] has raised is that your clients have acted in a manner to wholly frustrate and undermine [its] enjoyment and use of the easement."

¶ 30                        D. Pre-Trial Evidentiary Rulings

¶ 31    Prior to the start of trial, the trial court ruled on two motions *in limine* relevant here: HC's motion *in limine* to bar evidence of an unpermitted air conditioning unit resting on the easement and HC's motion *in limine* to bar evidence of the alleged ADA violation referenced in USP's third recording of termination.

¶ 32    As to the air conditioning issue, HC moved *in limine* to bar "[a]ny reference, evidence[,] or argument concerning any alleged permitting violations or other issues surrounding the installation of or maintenance of [HC's air conditioning] system or any other construction done at the premises insofar as the Defendant has provided no evidence in discovery relative to such issues."

¶ 33    USP argued that it had evidence to show that the air conditioner was installed without a proper permit. The air conditioner was a 2014 model. USP submitted a Freedom of Information Act (FOIA) request to the City of Elgin, which responded that it had no permit on file for the air conditioner after 2014. USP's offer of proof provided that, if allowed, it would introduce the following evidence in support of a paragraph 6(b) violation: (1) from approximately 2005 until

2014, HC used and stored an air conditioning unit on the easement; (2) 2004 and 2014 plats of survey that do not show an air conditioning unit on the easement; and (3) a 2014 FOIA response from the City of Elgin stating that it had no permit on file for an air conditioning unit in the easement area.

¶ 34 The trial court granted HC's motion. It explained: "I do not believe that if it were shown that the HVAC unit was installed without a city permit, that that would entitle [USP] to terminate the easement."

¶ 35 As to the alleged ADA violation, HC moved *in limine* to bar USP from introducing any evidence that its door and surrounding configuration was not ADA compliant. *USP* moved, in turn, to bar *HC* from introducing "any reference, evidence[,] or argument suggesting that the ADA door and its configuration *was* approved by the City of Elgin (including any of its departments or agencies) or otherwise complied with the requirements of the ADA." (Emphasis added.)

¶ 36 HC argued: "[W]e certainly have a permit. *** [I]f the court were to allow ADA testimony that the door was not properly constructed, I would certainly rebut [that testimony with] evidence that the City granted us a permit." And, "[In any event], my clients have a new ADA door which comes out to the sidewalk and no longer touches the easement anyway, so it's kind of a moot point moving forward." Finally, "[USP's argument is] that people used the easement to get to the ADA non-compliant door, but at some level, even if that's true, so what? The use of the easement is not in violation of anything. If the door itself is not compliant, the Department of Justice can do something about it."

¶ 37 USP responded that "the ADA access at issue is not simply the door. But rather the route one takes from the public way to the ADA accessible door." That route included the easement and, according to USP, the slope to access the door was not ADA compliant.

¶ 38    The trial court disagreed with USP: "I think your argument, while clever, is misplaced. The act of using the easement has to be the violation of law.  The only act of using the easement is traversing of the easement."  The court granted HC's motion *in limine*.

¶ 39    As such, heading into trial, the issues were whether: (1) HC materially breached the easement agreement, including paragraph 8 (proof of insurance), paragraph 6(a) (delivery vehicle practices), and 6(b) (guest behavior including photoshoots, urinating, and vomiting); (2) whether HC could continue to access the easement via the curb cut; (3) correspondingly, whether USP should remove the barriers to entry over the curb cut; and (4) whether USP should be prohibited from unilaterally terminating the easement.  The court would also consider whether HC was entitled to attorney fees pursuant to paragraph 9(c).

¶ 40                                    E. Trial

¶ 41                              1. The Haight Family:

Linda Haight, Doree Haight, Kari Goodmay, and John Haight

¶ 42    Linda Haight testified that she and her husband, who passed away in 2010, purchased the HC building some time between 1984 and 1987.  Originally, HC owned the U-shaped opening at issue in this case (the easement and parking lot, Parcels C and A).  However, HC and the owners of the 220 Spring Building performed a land swap.  HC granted the owners of 220 Spring Parcels C and A.  The owners of 220 Spring granted HC land on the other side of the HC building, not at issue here.  Though HC no longer had ownership of Parcels C and A, HC and the owners of 220 Spring entered into an easement agreement.  The easement ran along the east side of the HC building and enabled HC to access the delivery door.  Other than the easement agreement, there were no other written or oral agreements concerning Parcels C and A.  Since 1987, there have been three owners of the 220 Spring building.  The first, an original party to the easement agreement

(who did not testify at trial) was "loud and friendly." Linda never had a conversation with the first owner about the curb cut. The second, Denise Braun, was quiet but amicable. Linda never met Denise Braun. The third was USP.

¶ 43    Linda testified to certain aspects of the easement that had existed since its inception. HC's vehicles had always used the curb cut to access the easement at a diagonal. The curb, sidewalk, utility pole, and streetlamp had always stood as obstacles to a direct entry onto the easement. An air conditioning unit had always rested in the easement. Over the years it had been replaced with an updated model of the same size. In addition, a concrete ramp leading to a foot-traffic door, which stood beside the delivery door, had always existed in the easement.

¶ 44    Linda testified that HC had used the easement as a parking lot. HC's tenants parked along the easement. Painted white lines on the HC building's east wall can still be seen, and these lines delineated parking spots. Typically, five to six cars per day occupied the parking spots. This parking pattern occurred from 1987 to 2014. In 2014, USP bought 220 Spring and, separately, HC began to renovate its building to be used as a wedding venue.

¶ 45    Doree Haight testified that, when her parents purchased 166 Symphony in 1987, she was 11 years old. She and her siblings were at the building nearly every day. There has always been an air conditioning unit and a cement ramp resting in the easement. Cars always parked along the easement wall and in the parking lot. It could be a full parking lot or it could be as few as eight cars. Between 1994 and 2002, she lived away from home. However, she witnessed the same parking patterns when she visited. In the early 2000s as certain tenants left the building, fewer cars parked. However, between 2010 and 2013, HC hosted an annual art fair, which lasted one week and had as many as 100 patrons, many of whom parked in the easement. HC also hosted seasonal farmers' markets, again allowing patrons to park in the easement.

¶ 46    Doree testified that, in 2016, Bogdan placed a fence over the curb cut area. Before that, he blocked vendors "all the time" with a big truck or cement blocks. All the time meant three or four days per week. This began within months of USP's purchase of 220 Spring. On more than one occasion, Bogdan blocked in a vendor after the vendor had already entered the easement. One vendor was blocked in for three to four hours. Doree had to call the police.

¶ 47    Doree testified to an encounter with Bogdan while clearing snow with a mini-snowblower. Doree was shoveling along the easement. Bogdan physically blocked her with his body, and she could not proceed. He told her that, if she continued shoveling, then he would prefer that she shovel along the diagonal from the easement door to the gate (over the curb cut). He further threatened that, if she continued shoveling, then he hereby relocated the easement to be only the diagonal. She told Bogdan that he could not simply relocate the easement without notice and he responded that, yes, he could. She tried to ignore him and press on shoveling, but "he just stood right in front of me. Every which way I turned, he would just step in front of me[.]" Doree gave up and went inside.

¶ 48    Doree testified regarding HC policies to keep guests out of the easement and parking lot. Doree kept an iPad in her office which surveilled the area in hopes of stopping guests from going into the easement area. She also had placed "Do Not Enter" and "Property Under Surveillance" signs near the easement, but Bogdan moved the signs, believing them to be on his property. She moved the signs to the sidewalk.

¶ 49    Kari Goodmay testified that she spent time at the 166 Symphony building as a young child. She recalled playing on, and jumping off, the air conditioning unit and concrete ramp. Kari now worked for HC, handling event planning, finance, and attorney correspondence.

¶ 50    Kari e-mails vendors with instructions in advance of their arrival. Prior to the instant

lawsuit, vendors typically idled in the easement for 20 to 30 minutes. Since the lawsuit, Kari has instituted fast-delivery policies. Now, the vendors arrive one at a time, leave their engines running, and stay no more than 15 minutes when loading and unloading. (Doree had testified consistent with Kari on this point, though she estimated that the vendors took 10 minutes when loading and unloading).

¶ 51　Kari took measures to prevent guests from gathering to take pictures, smoking, urinating, and vomiting. Beginning in 2017, Kari instructed brides and grooms that their guests were not permitted in the easement and parking lot area. The couples would sign a contract to that effect. She is not aware of any photoshoots occurring after 2016 or 2017. She acknowledged that HC's website contained picture(s) from an old photoshoot that had taken place on the easement. She had posted the picture to congratulate the couple on their anniversary, not to advertise use of the easement as a place to take photos. She hired at least one, if not two, security guards per wedding event. Usually, one is stationed at the front door and one is stationed on the roof. She has instructed the security guards to keep guests off of the easement and parking lot area. The security guards were unable to prevent every instance of misuse, so, in 2019, she placed stanchions in front of the easement entrance. The stanchions helped but did not totally prevent the misuse. As a final measure, she has decided to ban any guest who is caught urinating or vomiting in the easement and parking lot area.

¶ 52　Kari acknowledged that, as of December 20, 2017, USP had not received proof that HC had renewed its insurance policy naming USP as an additional insured. However, up until that date, she had thought that the insurance company *had* sent USP a copy of the policy. Her insurance agent had previously told her that the insurance company would do so. Kari had no reason to question her agent's representation because, in reading the policy herself, she saw that the policy

named USP as an additional insured and set forth USP's correct business address. Further, she had seen 2014 documents reflecting correspondence between Sandra Stanek and the insurance company, so she was confident that the insurance company and USP knew how to contact one another.

¶ 53    John Haight also testified that he spent time at the building as a young child and, as he grew older, his father taught him how to maintain the building. He recalled the air conditioning unit being present on the easement from his earliest childhood days. In 2014, HC replaced the air conditioning unit with a newer unit of the same size.

¶ 54    John also recalled that tenants used to park along the wall of the easement. The remnants of white stripes painted on the wall delineated parking spaces. Typically, 5 to 10 cars per day parked in those spaces.

¶ 55    John testified to a 2014 encounter with Bogdan. John parked alongside the easement door as he had been doing for the last 15 years, since he was a young man first beginning to work at the building. Bogdan approached and told him to move his car or he would have it towed. There was no conversation or neighborly interaction. John moved his car.

¶ 56    John acknowledged that HC had not been wholly successful in preventing its guests from passing through the easement to urinate in the parking lot. HC had not hired a guard to stand watch directly in front of the easement.

¶ 57                    2. Testimony of HC Staff and Vendors:
            Lauren Schroeder, Toby Eshelman, James Walsh and Mark Link

¶ 58    Lauren Schroeder testified that she is employed by HC as an events manager. There was a period of time prior to 2019 when USP locked the gate over the curb cut, causing HC's vendors to traverse the easement by foot. Since USP reopened the gate, HC has practiced a fast delivery

procedure for its vendors.  HC sends its vendors an e-mail in advance of the event, instructing them to call HC staff prior to arrival.  HC staff will then open the gate.  The staff makes sure that only one vendor arrives at a time, that the vendors keep their vehicles running, and that the vendors leave as soon as they are done unloading. Each vendor usually makes two trips, one to unload and one to pack up.  However, vendors with many items may make as many as four trips.  No single trip lasts longer than 15 minutes.  Vendors using the easement include caterers, DJs, and, less frequently, florists and alcohol vendors.  (Doree had testified that, since 2017, HC procured its own alcohol, which it brought in through the front door, not the easement door.)

¶ 59    Toby Eshelman testified that he is employed as a bartender for HC.  Even after USP reopened the gate over the curb cut, Eshelman witnessed Bogdan block in vendors, making it difficult to get out.  Bogdan's actions turned a 4-point turn into a 17-point turn for HC's vendors. Eshelman estimates that it takes most vendors 6 to 10 minutes to unload and 12 minutes to pack up.  He encourages vendors with smaller deliveries to use the front door rather than the easement door.

¶ 60    James Walsh and Mark Link each testified that they own catering companies that frequently serve HC.  Walsh testified that, when USP locked the gate over the curb cut, he had to park in the street, unload on the sidewalk, and walk the catering supplies and food up the easement on dollies.  He does not feel comfortable driving his vehicle over the curb.  When the gate was reopened, in approximately 2018, he received fast delivery instructions.  Walsh confirmed the policy as testified to by Schroeder.  He further testified that a manager with a clip board usually observes him load and unload.  It usually takes him 5 to 7 minutes to unload hot food.  A different truck comes with the china.  It takes him 7 to 9 minutes to pack up equipment following an event. HC has told him from the beginning to respect the neighbors (USP).  He does not park in USP's

lot. Instead, upon entering the area from the curb cut, he performs an S-curve which allows him to pull alongside HC's easement.

¶ 61 Link also testified that, when USP locked the gate over the curb cut, he had to enter the easement on foot from the sidewalk. He has also tried the front door, but that is less ideal due to the stairs. The easement door makes his duties as a vendor "appreciably easier," because there is a freight elevator 20 feet on the other side of it. Even after USP reopened the gate, Bogdan blocked him in. In another instance, Bogdan confronted him while he was parked in front of the easement door, telling him that this was his private property. Link estimated that, absent any issue, it takes him 10 minutes to unload his vehicle and 15 minutes to pack up.

¶ 62                     3. 220 Spring's Former Owners and Tenants:

Denise Braun, Edward Miller, and James Zavacki

¶ 63 Denise Braun testified that she owned 220 Spring from 1995 or 1997 to 2014. Her husband passed away in 2002. From 1995 to 2002, her husband monitored the property. From 2002 to 2014, she monitored the property, visiting it a few times per month. There had always been one or two vehicles parked in the easement. Her husband was fine with it, and she was fine with it. She knew there was an easement, but she never looked into its terms. She knew the Haight family name, but she did not know them personally. She recalled one interaction with a Haight family member. She was standing in the curb cut area, talking on her cell phone. A male member of the Haight family sought to drive in over the curb cut to access the easement. Braun stepped aside and waved him in. She did not mind him using the curb cut to access the easement because she wanted to be a good neighbor and it was no bother. When she sold the property in 2014, she informed the Staneks at closing that the Haights used the curb cut to access the easement and that they parked their vehicles in the easement. She also told the Staneks that she "never had a

problem" with that practice.

¶ 64    Edward Miller testified that he helped manage 220 Spring from 2011 to 2014. He was on-site approximately once per month and more frequently during the fall. He occasionally saw one vendor in the easement area. He saw as many as 8 to 10 cars per day parked in the easement.

¶ 65    James Zavacki testified that he was a tenant at 220 Spring from 1997 to 2005. He ran a cheese processing plant. He could see the 166 Symphony building from his office window, and he characterized the activity level in the easement and parking lot as "near non-existent."

¶ 66                     4. USP Owners: Bogdan Stanek and Sandra Stanek

¶ 67    Bogdan Stanek testified that he and his wife purchased 220 Spring in 2014. He was looking for a warehouse to store equipment for one of his businesses, Castle Party Rental. He investigated the property for several years before purchasing it. He drove by the property at all times of the day. It was always very quiet, and he did not see vehicles parking in the easement.

¶ 68    At the time Bogdan purchased the property, he knew there was an easement agreement. He believed the easement to include only the 20 feet running immediately east of the 166 Symphony Way building. However, during the 2014-2015 timeframe, building remodelers parked all over the easement and parking lot. He would politely ask the contractors to leave his property, but they continued to stage their building projects on the easement. He pointed to USP's photographic exhibits of what appears to be men working on flower boxes and of drywall material leaned against the 166 Symphony building. In 2017, a Binny's truck parked in the USP parking lot in front of a USP loading door. This prevented him from accessing the door. Also, when cars parked on the easement, it made it difficult for him to access the easement for use as a driveway. From 2015 to 2019, HC guests gathered on the easement for hour-long photoshoots. This happened approximately twice per weekend during that timeframe. Also, wedding guests used the

easement to urinate and vomit. He occasionally saw a guest exit out of the easement door and urinate or vomit in the easement or the parking lot. Most of the time, however, guests entered the easement from the front sidewalk and urinated or vomited in the parking lot. He estimated that he saw guests urinate on the easement itself 3 times in the four-year period and on the parking lot 12 times in the four-year period. During the 2019 to 2021 timeframe, he saw a contractor's van parked in the easement several times for "30, 40, 60 minutes." One vehicle parked for as long as 78 minutes. In addition, on several occasions, a cleaning crew parked in the easement, arriving in the middle of the night and leaving at 6 a.m.

¶ 69 Bogdan denied using his truck to block the curb cut. He admitted that he put up concrete blocks to block the curb cut, but that was because he was concerned that taller delivery trucks would hit the utility power lines if they drove over the curb cut. He expected HC's delivery trucks to drive over the curb and alongside the 166 Symphony building, even though the telephone pole made for a somewhat narrow opening.

¶ 70 When HC filed the lawsuit, Bogdan removed the concrete blocks in front of the curb cut, giving delivery trucks 40 feet to enter. In fact, if he were to lose the instant lawsuit, he would like to relocate the easement to run in a diagonal from the curb cut to the easement door. He acknowledged that this was the same route that HC sought in its prescriptive easement, except that it would not include the portion of the original easement running alongside the 166 Symphony building between Symphony Way and the easement door.

¶ 71 Sandra Stanek testified consistent with Bogdan. She did, however, acknowledge that Braun told her at closing that HC parked in the easement area. She did not record a termination based on 2014 to 2016 activities, because, early on, she hoped to work things out. As to HC's wedding guests, she was concerned that their activities could diminish the value of her property

and increase her liability. Although she did not point to a time frame, she believed that guests took photographs while standing on the easement on a weekly basis. During the 2015 to 2020 timeframe, she believed guests urinated in the easement and parking lot area at least several times per year. She personally witnessed them and also had photographic evidence.

¶ 72    In addition, Sandra testified to the notice letters that she drafted and sent to HC. Relevant here, on December 20, 2017, Sandra notified HC that it had not deposited proof of insurance. As the parties agreed, on December 22, 2017, HC's attorney's secretary received the notice. On December 31, 2017, HC's attorney retired from the practice of law. On January 3, 2018, a different attorney at HC's law firm responded to USP's notice. The January 3, 2018, letter provided the proof of insurance. (As would become relevant to the prescriptive easement issue, the January 3, 2018, letter also informed USP that USP was the one acting against the terms of the easement agreement as contemplated by the original drafters to the agreement when USP blocked access to the easement via the curb cut.) However, on January 5, 2018, having not yet received the response, Sandra caused USP's termination of the easement to be recorded with the Kane County Recorder of Deeds. Sandra agreed that, by January 8 or 9, 2018, USP received HC's letter and proof of insurance. It did not, however, take action to revoke its termination.

¶ 73    In closing, HC asserted that certain language in the agreement encouraged conflict between the parties. It caused USP to believe that it had the unilateral right to terminate the easement just by filing a piece of paper and a right to relocate the easement just by declaring it so (as when Doree was trying to shovel). HC argued that these results were against public policy favoring the continuation of easements and were also absurd. HC acknowledged that the court could not rewrite the contract, but it asked the court to interpret the contract in a manner consistent with public policy and so as to avoid the absurd result witnessed mid-trial with USP recording its fourth, unfounded

termination. In HC's view, this would require the court to interpret the contract so as to provide HC with some method to adjudicate the termination prior to its recording.

¶ 74   USP responded that the termination provision unambiguously allowed USP to terminate the easement without court approval. Separately, USP offered a concession. Should the court terminate the easement, USP would allow HC to keep the air conditioning unit on the premises until the end of its mechanical life and it would allow contractors to enter the easement to maintain it.

¶ 75                                  F. Trial Court's Order

¶ 76   The trial court entered a nine-page written order. It evaluated each parties' credibility: "Linda Haight, *** the only party and witness to the creation and execution of the easement[,] *** testified credibly about the circumstances under which it was created, its purpose, and the understandings of the parties as evidenced by their actions and use of the premises." In contrast, "[t]he Staneks, as owners of USP, were not as forthright or believable in their testimony."

¶ 77   The trial court particularly noted USP's bad faith:

> "They obviously are displeased with owning a servient property, and they clearly hope to terminate the easement. This fact is evident in everything they have done and in their testimony. The Staneks['] initial installation of the fence and closing the gate was a clear interference with HC's rights under the easement. The parking of trucks [and] placement of concrete curb blocks interfered as well. The Staneks' animus for their neighbors is so pronounced that Mrs. Stanek attempted to serve a new notice of termination upon HC during the trial.
>
> None of the Staneks' explanations for what they did is justified. They were merely to frustrate and harass HC. If they were truly concerned about protecting their parking lot

[Parcel A], they could have sat down with the owners of HC and worked out reasonable ways to address their concerns."

¶ 78　The trial court made a preliminary determination that the easement agreement was ambiguous because the agreement purported to create an easement appurtenant, yet it contained a termination provision. In the court's view, the general rule that easements appurtenant terminate when the original purpose for the easement ceases to exist (*McCann v. R.W. Dunteman Co.*, 242 Ill. App. 3d 246 (1993)) was inconsistent with a provision allowing for termination in the event that the agreement's terms were breached. The trial court also determined that the easement agreement was ambiguous, because it did not delineate exactly how a vehicle was supposed to access the easement, yet it would be absurd to expect a vehicle to drive over the curb and between the building wall and utility pole, as opposed to over a designated curb cut just east of the easement.

¶ 79　The trial court next determined that the easement agreement's provision for termination in the event of a breach meant in the event of a *material* breach: "[E]vents that may result in termination must be those that are material to the intent of the parties. They cannot be merely technical, but must effect the purpose of the agreement." The court found no material breach as to any of the provisions at issue, paragraph 8, paragraph 6(a), and paragraph 6(b). As to paragraph 8, which requires HC to maintain insurance naming USP as an additional insured, the court wrote:

> "[Paragraph 8] requires HC to insure and indemnify USP against liability arising from HC's use of Parcel C. The important material term is the insurance and indemnification. Not the proof thereof. While HC is required to submit proof of insurance, given the fact that such insurance was in place at all relevant times, whether or not proof was timely deposited is a non-issue. No [material] breach occurred."

¶ 80    As to paragraph 6(a), which prohibits HC from impeding USP's use of the easement, the trial court wrote:

> "Paragraph 6(a) prohibits HC from impeding USP's use of the lot or storing property in the designated easement area.  This provision must relate to permanent violations of this type, and they must affect USP's enjoyment of its property.  Temporary parking of vehicles accessing 166 [Symphony] via the easement was contemplated ***[.] *** The only party affecting the other's rights to use the easement was USP repeatedly placing trucks and obstructions in the lot and in the easement to frustrate and prevent HC's access."

The court determined that HC could continue its current "parking" practice of allowing large delivery vehicles to idle in the easement while delivering items to the easement door.  The court did, however, determine that paragraph 6(a) precluded HC from parking on the easement for long periods of time, as it had in the early years.

¶ 81    As to paragraph 6(b), which prohibits HC from using the easement in a manner that constitutes a nuisance or violation of law or ordinance, the court wrote:

> "[T]he parties recognized a need to prevent the misuse of Parcel C, and further to prevent a slander on title to Parcel A.  The instances raised by USP amount to neither.
>
> [As to public urination and vomiting], [m]any of [HC's] patrons committed acts that are likely violations of law ***.  Nevertheless, these are the acts of the patrons, not that of HC.  *** These patrons were not 'permitted users' of Parcel C when they [performed these acts]."

Similarly, the court determined that HC did not authorize the photoshoots.  It further noted, "[T]his activity in no way injures the reputation of Parcel A."

¶ 82    The court addressed its decision to exclude evidence of alleged ADA, air conditioning unit, and sprinkler system non-compliance: "Whether or not an emergency sprinkling system or a concrete ramp is fully up to Code has nothing to do with the *use* of the *easement*. *** Furthermore, these types of minor issues cannot equate to the type of misuse contemplated by the parties at creation."  (Emphasis in original.)

¶ 83    The court resolved the ambiguity as to how HC was to access the easement by determining that HC could continue to access the easement via the curb cut.  The primary basis for its decision was that the original parties to the agreement contemplated use of the curb cut, and to interpret the agreement otherwise would lead to an absurd result.  Without use of the curb cut, drivers would risk damage to their vehicles by driving over a curb and navigating around a utility pole and would violate the Vehicle Code by driving over a sidewalk.  The court found in the alternative that, if the original parties did not contemplate the use of curb cut, then HC acquired a prescriptive easement over the same.

¶ 84    The trial court granted HC's request that USP remove barriers to entering the easement via the curb cut, with modification.  The court did not require USP to remove the fence and gate over the curb cut.  Instead, USP could leave the gate latched from the inside, but not locked, so that HC's permitted users could use the curb cut to access the easement.  The court did order USP to remove all concrete blocks, as they pose unreasonable navigation hazards within the easement and parking lot.  USP was also to refrain from parking its vehicles in a manner so as to obstruct access to the curb cut.  The court ordered HC to erect, at its expense, a fence and gate from the front eastern edge of its building to the western edge of USP's fence.  The fence was to have a pedestrian gate for purposes of ingress and egress to the easement.  The gate was to be latched in a way that prohibits unauthorized access from Symphony Way to the easement.  Thus, the entire U-shaped

opening would be fenced in, and the fence would have two gates: one providing entrance directly into the 20-foot easement for foot traffic and one providing entrance over the curb cut for vehicular traffic.

¶ 85     The trial court declined to read the agreement to allow for USP to unilaterally terminate the easement, apparently accepting HC's argument that allowing as much would violate public policy and perpetuate the absurd results witnessed and discussed at trial.  After noting that there had been no material breach of the easement and that USP's recordings of termination were null and void, the court noted that, moving forward: "[B]oth parties are permanently enjoined from altering, modifying, or terminating the easement without prior written agreement, or leave of court."

¶ 86     Finally, the trial court addressed the question of attorney fees.  The court entered a two-part order, the second part of which effectively canceled out the first:

> "D. Pursuant to paragraph 9 of the easement [agreement], [HC], as the prevailing party, are awarded their reasonable attorney fees incurred by them to prosecute this action. ***
>
> F. Regarding [USP's] [request for] indemnification [based on paragraph 8 of the easement agreement], the court finds that, pursuant to its equitable powers, [USP] is entitled to reimbursement from [HC] for the full amount of any judgement for [HC's] attorney's fees entered against [USP] in accordance with paragraph D above.  Apart from that, parties to [bear] their own costs."

This appeal followed.

¶ 87                                    II. ANALYSIS

¶ 88     USP appeals the first five of the trial court's findings: (1) the court's finding of no material

breach of easement agreement paragraphs 8, 6(a), and 6(b); (2) the court's reiterated basis for excluding evidence of other alleged 6(b) violations, such as the air conditioning unit and ADA compliance; (3) the court's order that HC was permitted to use the curb cut to access the easement; (4) the court's corresponding order that USP remove barriers to entry; and (5) the court's determination that USP could not unilaterally terminate the easement. For the reasons that follow, we reject USP's arguments and affirm on these five issues.

¶ 89    HC cross-appeals, arguing that the fee-shifting provision entitled it to attorney fees and the indemnification provision could not serve to cancel out the fee-shifting provision. For the reasons that follow, we agree with HC's argument and reverse and remand for the trial court to determine a proper attorney fee award.

¶ 90    We first address principles of law common to several of the claims. When interpreting the terms of an easement, courts utilize standard contract interpretation principles. See *La Salle National Trust v. Village of Westmont*, 264 Ill. App. 3d 43, 67 (1994). The best indicator of intent is the plain language of the document. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). The document must be considered as a whole, giving effect to every word, clause, and sentence, and with each provision construed in connection with the other relevant provisions of the document. *Palm v. Holocker*, 2018 IL 123152, ¶ 21 (interpreting a statute); *Standlee v. Bostedt*, 2019 IL App (2d) 180325, ¶ 55 (interpreting a restrictive covenant). We will not interpret a document so as to lead to an absurd result. *Foxfield Realty v. Kubala*, 287 Ill. App. 3d 519, 524 (1997). Interpreting the terms of an easement presents a question of law, which we review *de novo*. *Avery v. State Farm Mutual Auto Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

¶ 91    Once the terms of the contract are understood, however, whether a breach has occurred is a question of fact, the answer to which may be reversed only if it is against the manifest weight of

the evidence. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006). Here, the trial court determined that a breach means a *material* breach. Again, the court stated: "[E]vents that may result in termination must be those that are material to the intent of the parties. They cannot be merely technical, but must effect the purpose of the agreement." We agree with the trial court on this point, as it is consistent with common law. In general, only a material breach by one party will justify the non-performance of the other. *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346 (2005). Determining whether a material breach occurred

> "is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." (Internal quotation marks omitted.) *William Blair*, 358 Ill. App. 3d at 346 (quoting *Sahadi v. Continental Illinois National Bank & Trust Co. of Chicago*, 706 F. 2d 193, 196 (7th Cir. 1983)).

In addition, a material breach warranting the recission or termination of the contract is one that is so significant that, had it been known in advance, the agreement would not have been made. *CC Disposal, Inc. v. Veolia ES Valley View Landfill, Inc.*, 406 Ill. App. 3d 783, 790 (2010).

¶ 92    Thus, we reject USP's opening position that this case presents a pure question of law. Instead, it was for the trial court to weigh the evidence and determine, according to the principles set forth in *William Blair*, whether a breach occurred. We also reject USP's opening position that *any* technical non-compliance would justify a termination of the easement. The agreement does not so provide and, moreover, such an interpretation would go against general principles of

contract interpretation and general policy favoring the preservation of easements. See *William Blair*, 358 Ill. App. 3d at 346; *McCann*, 242 Ill. App. 3d at 258 (public policy favors the preservation of easements).

¶ 93   We would note, for context, that the instant case was filed in a court of chancery, where the dominant consideration is equity. See *Continental Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 577-82 (1997). Generally, courts of chancery award equitable relief and courts of law award damages. See *id*. at 579. However, every circuit court is vested with equitable powers and "that equitable relief is available even where a case is pending in the Law Division." *Id*. at 578. "The character or nature of the court and the relief available to a plaintiff are derived from the substance of the claim before it." *Id*. at 579. By way of example, an action for breach of contract is a classic action at law. *Id*. An action for an injunction, in contrast, invokes the court's equitable powers. *TIG Insurance Co. v. Canel*, 389 Ill. App. 3d 366, 370 (2009). Finally, an action for a declaratory judgment is not strictly legal or equitable but "take[s] [its] character from the nature of the relief declared." *Continental Casualty*, 286 Ill. App. 3d at 578.

¶ 94   Here, HC filed its action in a court of chancery and, generally, sought equitable relief: the preservation of the easement, the removal of barriers to the easement, the right to access the easement via the curb cut, and an end to USP's alleged abuses in filing frivolous terminations. USP filed a counter action in the same court of chancery, seeking declaratory judgment and, alternatively, breach of contract. While the character of USP's breach of contract action in particular is one of law, we remain cognizant that the trial court ultimately viewed the case consistent with HC's approach. Thus, the overall character of the proceedings, consistent with the chancery court in which they were filed, was equitable in nature.

¶ 95    There *is* one preliminary issue with which we agree with USP.  That is, we disagree with the trial court that an easement agreement creating an easement appurtenant cannot also contain a termination provision.  An easement appurtenant merely means that "one terminus is on the land of the party claiming the easement, who is considered the owner of the 'dominant estate' ***; [and] the only essential element is that it inhere in or concern the land of that party."  *Heritage Standard Bank and Trust Co. v. Trustees of Schools of Township No. 37 North*, 84 Ill. App. 3d 653, 656 (1980); see also *527 S. Clinton v. Westloop Equities, LLC*, 2014 IL App (1st) 131401, ¶¶ 29-30, 35 (enforcing the termination provision of an express easement appurtenant). Nevertheless, the trial court's inaccurate comment in this regard does not undercut the entirety of its ruling.

¶ 96    Also, our review of the trial court's decisions regarding the alleged breaches does not depend on its initial finding that the easement agreement was ambiguous.  The question of whether the easement agreement is ambiguous most directly impacts the curb cut issue, which we discuss in greater detail below.  Briefly, whether we look to the parties' past practices because the agreement is unclear as to how HC is to access the easement or because interpreting the contract to require delivery vehicles to navigate over a curb and between a utility pole would be absurd, the result is the same.  We now turn to the trial court's specific findings.

¶ 97                    A. Paragraph 8: Proof of Insurance

¶ 98    As to this issue, paragraph 8 provides in relevant part:

    "8. Indemnification.  ***.  Grantee shall at all times maintain with a reputable insurance company licensed to do business in the State of Illinois a policy or policies of insurance insuring against liability for personal injury or property damage having a combined single limit of $1,000,000: such policy of insurance shall expressly name

indemnitees as additional insureds *and proof thereof (and of all renewals thereof) shall be deposited with indemnitees*." (Emphasis added.)

¶ 99    USP concedes that HC at all relevant times maintained the appropriate insurance policy naming USP as an additional insured. USP instead argues that HC failed to deposit proof with USP that it maintained said insurance policy and that HC's failure to do so constitutes a material breach of the easement agreement. USP contends that the requirement that HC deposit proof of insurance was not a mere technicality, because, without proof of insurance, USP was subjected to constant worry that HC and the actions of its guests created a liability for it.

¶ 100   For the reasons that follow, however, the trial court's finding of no material breach was not against the manifest weight of the evidence. The parties do not dispute that, on December 20, 2017, USP sent HC's attorney written notice that it had not received the proof of insurance. On December 22, 2017, the Friday before Christmas Eve, HC's attorney's receptionist received the notice. Four business days later, on December 31, 2017, HC's attorney retired from the practice of law. Two business days after that, on January 3, 2018, a different attorney at the same firm answered USP's notice. She provided USP with a copy of the insurance policy showing USP as an additional insured. On January 5, 2018, having not yet received HC's response, USP recorded its termination of the easement. On January 8 or 9, 2018, USP received HC's January 3, 2018, letter and copy of the insurance policy.

¶ 101   Moreover, Kari Goodmay testified that, prior to December 20, 2017, she believed that the insurance company had mailed USP a copy of the insurance policy. She recalled her insurance agent informing her that a copy of the policy would be mailed to USP. She did not question her insurance agent's representation, because, in reading the insurance policy herself, she saw that the policy named USP as an additional insured and set forth USP's address.

¶ 102    The court reasonably determined that the most important aspect of paragraph 8's insurance requirement was that HC maintain the appropriate insurance. Nevertheless, accepting for the sake of argument that requiring proof of the same was more than a mere technicality, the court was not required to find a material breach under this set of facts. The easement agreement does not specify whether the seven-day cure period includes weekends and holidays. If the seven-day cure period does include weekends and holidays, then USP's decision to send notice over the Christmas and New Year's holidays—as well as its decision to record the termination without calling to inquire whether HC planned to respond—is consistent with the trial court's finding that USP looked for any reason to terminate the easement. If the seven-day period does not include weekends and holidays, then HC arguably satisfied USP's request within the seven-day period, which would have ended January 4, 2018, when it responded on January 3, 2018. In sum, the court reasonably found HC to have materially complied with paragraph 8, because: HC maintained the appropriate insurance; HC believed that the insurance company had sent USP proof of insurance; and, upon learning that was not the case, HC responded within six business days to USP's request, despite the challenging circumstance that the seven days at issue fell on either side of two major holidays and the retirement of HC's attorney.

¶ 103                    B. Paragraph 6(a): Blocking the Easement

¶ 104    Paragraph 6(a) provides:

> "6. Restriction on Use of Driveway Easement. *** [N]either Grantee nor Grantee's Permitted Users shall make use of Parcel C in such a way as to:
>
> (a) Block, impede, or impair the use of parcel C by Grantor or Grantor's authorized agents, or use said Parcel C for the storage of any property[.]"

¶ 105    USP appears to concede that the original parties to the easement agreement contemplated

that HC and its permitted users could drive in a vehicle to deliver goods to the delivery door. Indeed, paragraph 2(a) of the easement provides that HC will be permitted to traverse the easement "with or without a vehicle of any description *** for driveway purposes and for the purpose of access, ingress and egress to and from Parcel B [the 166 Symphony building.]" Rather, USP argues that the original parties to the easement agreement did not contemplate the degree to which HC would burden the easement with said use. It notes that the dominant estate cannot alter its use of the easement in such a way as to unduly increase the burden on the servient estate. *McCann*, 242 Ill. App. 3d at 255.

¶ 106  The instant case is distinguishable from *McCann*, where the owners of the dominant estate increased traffic on the easement in order to access two additional parcels of property. *Id*. at 256. The *McCann* court expressly distinguished its facts from a situation where the increased burden is due to the normal development of the original property. *Id*. Here, any increase in burden was due to the normal development of the original property. USP agreed at oral argument that HC uses 166 Symphony in a manner consistent with zoning ordinances. And, for the reasons that follow, the trial court was not required to find that the increased burden, if any, was so extreme as to warrant termination of the easement.

¶ 107  Six witnesses testified in support of HC's position that there was a history of parking in the easement, such that HC's present "parking" practice of vendor loading and unloading represented a comparatively *lower* burden on the easement. The four Haights testified that their tenants had always parked on the easement, with Linda and John going so far as to reference the painted parking notches on the east wall. Collectively, the Haights recalled the parking burden to be 5 to 10 cars per workday from approximately 1987 to the early 2000s. In the early 2000s, tenant occupancy was lower, but, in 2010, the 166 Symphony building became host to an annual art fair

and a seasonal farmers' market, once again inviting multiple cars to park in the easement. Braun confirmed that, between 1995 and 2014, vehicles parked in the easement. Also, Miller observed that, between 2011 and 2014, as many as 10 vehicles at one time would park on the easement.

¶ 108   To be sure, Zavacki, a tenant at 220 Spring from 1995 to 2005, characterized the activity at 166 Symphony as near non-existent. Also, Sandra and Bogdan Stanek testified that, between 2011 and 2014 when they were deciding whether to purchase 220 Spring, they observed very little activity on the easement. However, the trial court expressly found Linda to be more credible than the Staneks and was free to credit her testimony regarding the historical use of the easement.

¶ 109   Other evidence supports that HC did not presently burden the easement so as to constitute a breach of paragraph 6(a). As HC acknowledges, in 2014, during the initial conversion of the wedding venue space and florist shop, vendors and renovators did park for longer periods of time. Construction materials, such as drywall, were leaned up against the wall of 166 Symphony. And, in 2017, there was one occasion where a Binny's delivery truck parked for more than one hour in USP's parking lot, blocking USP's access to its loading door. Per Kari, between 2014 and 2018, vendors may have taken as long as 20 to 30 minutes to load and unload. However, following complaints by USP, HC instituted new protocol. HC now instructs its vendors to arrive one at a time, be as quick as possible, and keep their engine running. Multiple witnesses testified that it has been successful in this measure.

¶ 110   We also acknowledge that Bodgan testified that, in the 2019 to 2021 timeframe, he witnessed HC's workers parking for over 30 minutes and, on one occasion, for 78 minutes. Also, a cleaning crew arrived in the middle of the night, parked on the easement, and did not leave until 6 a.m. Still, on the whole, the evidence supports the trial court's determination that HC's current use of the easement to load and unload vendor vehicles is consistent use of the easement as

contemplated by the original parties. This is particularly true where the court also found that the Staneks lacked credibility and that the *Staneks*, in fact, blocked and impeded *HC*'s use of the easement. The court's finding that HC's current parking practices did not constitute a material breach of paragraph 6(a) of the easement agreement was not against the manifest weight of the evidence.

¶ 111                                    C. Paragraph 6(b): Misuse

¶ 112   Paragraph 6(b) provides:

>    "6. Restriction on Use of Driveway Easement. *** [N]either Grantee nor Grantee's
>    Permitted Users shall make use of Parcel C in such a way as to:
>
>    ***
>
>    (b) Create any public or private nuisance or violate any laws, ordinances, or
>    regulations of any applicable governmental body, or otherwise injure the reputation
>    of Parcel A or Parcel C."

¶ 113   USP complains of the following statement by the trial court regarding public urination and vomiting: "[T]hese are the acts of the patrons, not that of HC. *** These patrons were not 'permitted users' of Parcel C when they [performed these acts]. *** [T]here is no evidence that HC encouraged or approved of the conduct."

¶ 114   The complained of quote does not, as USP suggests, show that the trial court rewrote the contract to ignore the plain meaning of the term "permitted user." Rather, the complained of quote is in the nature of a factual finding. We afford deference to the trial court's factual findings, and we presume that the court was referring to Kari's testimony that HC implemented a policy of revoking a person's guest status if the person is caught urinating or vomiting in the easement or

parking lot. The evidence supports both the complained of quote and the court's overall determination of no material breach under paragraph 6(b).

¶ 115 The parties agree that the urinating and the vomiting, as opposed to the photoshoots, presents the bigger problem. Doree testified that, since USP complained, all prospective couples are required to sign a contract agreeing not to take photographs in or otherwise use the easement area. Similarly, Kari testified that she is not aware of any photoshoots occurring since 2016 or 2017 when tensions heightened between HC and USP. The trial court credited Doree and Kari's testimony. Also, the trial court was not required to find that the photoshoots ever were a nuisance to USP to a degree as would warrant terminating the easement. In any event, the trial court did not err in declining to terminate an easement in 2021 based on a problem that had largely resolved itself by 2017.

¶ 116 In contrast to the photoshoots, HC acknowledged that guests continued to enter the easement from the sidewalk and proceed to urinate or vomit, either in the easement itself or in the parking lot. However, Doree testified that, since HC had been notified of the problem, HC has taken measures to prevent it and the situation has improved. Doree put up a "do not enter sign" beside the easement. She also put up a sign informing persons that the area was under surveillance, but Bogdan, believing the signs to be on USP property, moved them. She placed a surveillance camera near the area, which was linked to an iPad in her office. She also asked a security guard or a manager to guard the area. Kari testified that she placed stanchions between the east wall of HC's building and the western edge of USP's fence. According to Kari, the stanchions improved but did not completely resolve the problem.

¶ 117 Under these circumstances, the trial court was not required to find a material breach of paragraph 6(b) so as to warrant the termination of the easement agreement. The court reasonably

balanced HC's efforts to improve the situation against USP's "harassing" and unhelpful behavior. Sandra agreed that she did not notify HC that its guests were urinating and vomiting in the parking lot until June 2018, after HC filed the instant lawsuit to protect its right to the easement. As the trial court noted, had USP been willing to work with HC, the parties could have solved the problem by, as the trial court ordered, fencing in the entire entrance to the U-shaped opening, with gates for HC's true permitted users to pass. Mindful that it is the trial court that must decide whether a breach is of a character that warrants termination of an easement, that public policy favors the preservation of the easement, that HC made efforts to correct the problem, and that the court was able to issue the remedy of completely enclosing the U-shaped area, the trial court's finding of no material breach of paragraph 6(b) is not against the manifest weight of the evidence.

¶ 118                    D.  The Trial Court's Exclusion of Evidence

¶ 119  USP challenges the court's decision, following a hearing on HC's motion *in limine*, to exclude evidence that the air conditioning unit was unpermitted and that the easement door and entrance area was non-ADA compliant. USP cites no case law in support of its position, nor does it provide the standard of review for evidentiary rulings. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "The failure to cite relevant authority violates Rule 341 and *can* cause a party to forfeit consideration of the issue." (Emphasis added.) *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. We nevertheless proceed in the analysis and determine that USP has, for other reasons, forfeited its claim regarding the air conditioning unit, and has failed to present a compelling argument regarding the exclusion of the ADA evidence.

¶ 120  We review a trial court's ruling on a motion *in limine* for an abuse-of-discretion. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646 (2010). Also, "[i]t is the function of the trial court to determine the admissibility and relevance of evidence, and its ruling will not be disturbed absent an abuse of

discretion." *Id.* A trial court abuses its discretion where no reasonable person would take its view. *Id.* Even if the trial court abuses its discretion in excluding evidence, however, reversal is not required unless the party who sought to admit the evidence suffers substantial prejudice. *Neuhengen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 157. The burden of showing substantial prejudice, such that the result of the proceeding would have been different, is on the party who sought to have the evidence admitted. *Id.*

¶ 121                                    1. Air Conditioning Unit

¶ 122   USP argues that "[a]lthough the circuit court allowed testimony on this matter from [HC's] witnesses, the [court] excluded evidence and argument by [USP] that *no* air conditioning unit had been present in the Easement as of 2004, and that the City of Elgin had no record of any permit being on file for the air conditioning unit that [HC] subsequently placed on the Easement." (Emphasis in original.) It reasons that, if it had been able to show that no air conditioning unit had been present on the easement as of 2004, then it could have countered the trial court's determination that the original parties to the agreement had contemplated that the air conditioning unit would rest on the easement and it could have shown that HC violated paragraph 6(a) concerning blocking the easement.

¶ 123   USP has forfeited this argument. Issues not raised below are forfeited. *Wells Fargo Bank, N.A. v. Maka*, 2017 IL App (1st) 153010, ¶ 24. Also, failure to make an adequate offer of proof forfeits the claim on appeal. *Turgeon v. Commonwealth Edison Co.*, 258 Ill. App. 3d 234, 240-41 (1994).

¶ 124   Here, HC moved *in limine* to bar evidence that the air conditioning system did not have a city permit. The motion *in limine* spoke to paragraph 6(b) concerning ordinance violations, *not* paragraph 6(a) concerning blocking the easement. USP's subsequent offer of proof likewise

centered on paragraph 6(b), not paragraph 6(a). See *supra* ¶ 33. The trial court was not asked to consider the admissibility of evidence that the air conditioning unit was not an original part of the easement and, thus, USP cannot now argue that the trial court abused its discretion in excluding the evidence for that purpose.[1]

¶ 125 Forfeiture aside, even if USP's evidence had been admitted to show that HC violated paragraph 6(a), USP's evidence would not have contradicted HC's witness testimony that an air conditioner had rested on the easement since before 1987. USP admitted that there was an air conditioner on the property from approximately 2005 onward, even though the 2014 plat of survey did not show it. Thus, it can be inferred that the plats of survey do not reliably depict whether air conditioning units rest on the easement. That the 2004 plat of survey depicts no air conditioning unit does not create a strong inference that there was, in fact, no air conditioning unit in 2004. Also, USP offered no evidence to suggest, one way or the other, whether there was an air conditioning unit on the easement between 1987 and 2003. Finally, we note that, in its closing argument, USP stated that, should the easement be terminated, it would agree to grandfather-in the air conditioning unit for the remainder of its mechanical life. Said concession suggests that the air conditioning unit does not actually present an obstacle to USP in navigating the easement and supports the trial court's view that USP sought any basis to terminate the easement.

¶ 126                         2. ADA Compliance

---

[1]In its reply brief, USP argues that, had the court admitted the excluded evidence, it would have been able to establish a 6(b) violation. However, arguments raised for the first time in a reply brief are forfeited. See Ill. S. Ct. R. 341(h)(7); *People ex rel. Village of Vernon Hills v. Village of Lincolnshire*, 283 Ill. App. 3d 266, 271 (1996).

¶ 127   USP argues the trial court misinterpreted paragraph 6(b) of the easement agreement when it excluded evidence supporting an ADA violation.  USP's primary allegation had been that the easement door violated the ADA because HC was using the door both as a service entrance and as an ADA entrance.  The trial court determined that the primary allegation was not relevant, because the door was separate from the easement.  It stated at the hearing on the motion *in limine* that "[t]he act of using the easement has to be the violation of law.  \*\*\* The fact that the door itself does not comply with the ADA doesn't transform the traversing of the easement to be a \*\*\* violation of any ordinance or law."  USP notes that paragraph 6(b) does not provide that the "act of using the easement has to be the violation of the law."  Rather, it provides "neither [HC] nor [its] Permitted Users shall *make use of [the easement] in such a manner as to* \*\*\* violate any laws, ordinances, or regulations."  (Emphasis added.)  USP urges that even if using the easement to get to the door is not a violation of law, HC has, nevertheless, "made use of" the easement so as to violate the law, because it allows its users to walk over the easement up to an allegedly non-compliant entrance.  USP further notes that it is not just the entrance that is non-compliant, but also the surrounding area, such as the easement's slope.

¶ 128   USP focuses on a specific statement made by the trial court at the hearing on the motion *in limine* to the exclusion of another, broader point set forth in the court's final written order.  There, the trial court determined that many of USP's alleged violations of the easement agreement were minor points, brought up merely to harass HC.  The court provided: "Whether or not \*\*\* a concrete ramp is fully up to Code has nothing to do with the use of the easement.  \*\*\*. *Furthermore, these types of minor issues cannot equate to the type of misuse contemplated by the parties at creation*."  (Emphasis added.)

¶ 129   USP has not made any argument as to why the trial court, after sitting through the evidence

in the case, abused its discretion when assessing that an improperly graded ramp is not the type of misuse that would warrant a termination of the easement and that USP's complaints, generally, amounted to harassment. Indeed, USP did not allege an ADA violation until HC attempted to explain, in an earlier pleading, that *USP's* act of blocking the easement created an inconvenience for its disabled guests. Similarly, USP does not address certain points raised by HC at hearing on the motion *in limine*, such as that HC had obtained an ADA permit for its easement entrance and, in any case, it had since moved its ADA entrance to the front door, so as to demonstrate that the result in this proceeding might have been different had the court allowed the evidence. Under these circumstances, we cannot find that the trial court abused its discretion.

¶ 130                    E. HC's Access to the Easement Over the Curb Cut

¶ 131   USP challenges the trial court's holding that HC can continue to use the curb cut to access the easement, as well as its corollary order to allow HC access through the gate over the curb cut. However, USP does not challenge the trial court's primary basis for its holding—that the original parties to the easement agreement contemplated that HC would use the curb cut to access the easement. Instead, it focuses on the trial court's alternate basis for its holding—that, if the original parties to the agreement did *not* contemplate that HC would use the curb cut to access the easement, then HC gained that privilege by prescriptive easement. HC responds only to USP's challenge to the trial court's alternate basis, leaving the trial court's primary basis untouched.

¶ 132   Again, the trial court determined that the easement agreement was ambiguous as to how HC was to access the easement. There were obstacles to direct access, but a curb cut just east of the easement made for easy access. The court found that the original parties to the agreement intended for HC to access the easement via the curb cut. We quote the trial court's explanation for context:

"[Just as the original parties to the easement agreement contemplated that an air conditioning unit would rest on the easement], it is equally clear that the parties to the easement's creation contemplated that the easement would be accessed via the only curb cut to and from Symphony [Way] and the parking lot. That curb cut is located several feet east of the eastern boundary of the easement.

It is true that the easement references only the 20 feet immediately east of 166. However, the street curb, city parkway, [sidewalk], and telephone pole situated in and south of the easement's southernmost boarder, renders access directly from the easement's south border illegal and impracticable. USP argues that it is possible to maneuver some vehicles over and onto the southern boundary. This argument misses the point, ignores the Illinois Vehicle Code and the clear intent of the original parties.

First, 625 ILCS 5/11-1412.1 [of the Vehicle Code] prohibits driving upon a sidewalk except upon a permanent or duly authorized temporary driveway. Such as the curb cut. Secondly, the easement allows vehicular traffic of 'any description' to access the easement. A vehicle of 'any description' could range from a small sub-compact car to a semi-trailer. The parties certainly did not intend to force HC to drive over the sidewalk and curb. Nor did it intend to limit access only to vehicles nimble and small enough to maneuver the sidewalk, curb, and telephone pole. Lastly, [Linda's] testimony definitively established that the curb cut was always used for vehicular traffic to and from the area adjacent to 166 ***."

¶ 133 Additional evidence supported the trial court's findings. One of the vendors, Walsh, testified that he was afraid that he would damage the bottom of his vehicle were he to drive over the sidewalk to enter the easement head-on. Linda testified that the sidewalk, curb, and telephone

pole had always stood as obstacles to entering the 20-foot-wide easement head-on. The current photographic evidence depicted the same constellation of obstacles as existed in 1987. Our review of the photographic evidence confirms the reasonableness of the trial court's determination that it would be difficult, if not dangerous, for certain vehicles to navigate the curb, sidewalk, and narrow opening.

¶ 134 Basic principles in contract interpretation also support the trial court's finding. We agree that it would be absurd to interpret the easement agreement as requiring the parties to violate the Vehicle Code and risk damage to larger vehicles and to the telephone pole. See *Foxfield*, 287 Ill. App. 3d at 524 (a contract should not be interpreted to lead to an absurd result). Where a contract is unclear as to a matter, the original parties' past performance on the contract is indicative of their intent. *Standlee*, 2019 IL App (2d) 180325, ¶ 56. Here, as Linda testified, HC accessed the easement from the curb cut from the inception of the easement agreement.

¶ 135 Silence as to "essential particulars" in a contract may create an ambiguity authorizing the trial court to turn to parole evidence. *Farnsworth v. Lamb*, 6 Ill. App. 3d 785, 789 (1972). Here, HC was granted an easement for use by "vehicles of any description," but the agreement was silent as to how the vehicles were to access the easement. As stressed by the trial court, accessing the easement straight on from the street would require drivers to violate the Vehicle Code. Thus, the trial court properly turned to parole evidence, such as the parties' past use, to determine the access point intended by the original parties to the agreement.

¶ 136 This case is distinguishable from the case USP cited at oral argument, *La Salle*, 264 Ill. App. 3d at 67-68 (citing *Abbott v. Amoco Oil Co.*, 249 Ill. App. 3d 774, 785 (1993)), for the proposition that a court may not rewrite the parties' contract or add terms. In *La Salle*, the court held that the agreement was not ambiguous merely because it was silent on the question of

residential development. *Id*. at 67-68. In support, it noted that the agreement expressly precluded industrial development. *Id*. at 68. If the parties to the agreement wished to exclude residential development, they would have so provided. *Id*. The *La Salle* agreement's silence as to residential development did not constitute an essential missing term in the same way that the instant agreement's silence as to how vehicles may access the easement constitutes an essential missing term. The parties in *La Salle* were free to allow or preclude residential development. The parties to the instant agreement could not preclude access to the easement—an easement cannot exist without an access point. Having determined that the evidence and the law support the primary basis for the trial court's ruling, our analysis could end here.

¶ 137   Nevertheless, we briefly discuss the trial court's alternate basis for designating the curb cut as the access point to the easement—a prescriptive easement. The trial court did not provide an explanation for its alternate basis, but it essentially reasoned that if the original parties to the agreement did not contemplate the curb cut as the access point, then Linda simply acted according to a one-sided belief that she had a right to access the easement via the curb cut. The court's implied finding is that such action is consistent with one who is claiming the right to use the land rather than one who is acting according to the permission of another.

¶ 138   To establish a prescriptive easement, a party's use must be open, uninterrupted, continuous, exclusive, and adverse for a period of 20 years. *Nationwide Financial, LP v. Pobuda*, 2014 IL 116717, ¶¶ 28, 45. Here, the element of adverse use, as opposed to permissive use, is the only element in real dispute. The trial court's determination of whether the use is adverse or permissive is one of fact, not to be disturbed unless it is against the manifest weight of the evidence. *Wehde v. Regional Transportation Authority*, 284 Ill. App. 3d 297, 311 (1996).

¶ 139   The element of adversity is synonymous with a claim of right. *Nationwide*, 2014 IL

116717, ¶ 44. The party seeking the easement must have enjoyed the land under such circumstances as would indicate he or she had taken it as of right. *Id.* "It is not essential that there should be proof that the claimant of an easement made any oral declaration of a claim of right, but it will suffice if the facts show that he acted so as to indicate that he did claim the right to such use." *Id.* Further, the use must be with the knowledge or acquiescence of the owner, but without the owner's permission. *Light v. Steward*, 128 Ill. App. 3d 587, 595 (1984). Permission, in turn, may be established by written or oral license or may be inferred from the surrounding circumstances. *Id.* at 591. Use that originates from a neighborly relationship *can* indicate permissive use, but evidence that the parties were "on pretty good terms," "never had any problems" with one another, and waved at one another while using the land is generally insufficient to establish the same. *Schultz v. Kant*, 148 Ill. App. 3d 565, 571-72 (the friendly wave was discussed with reference to the open element). These sorts of behaviors fall in the category of acquiescence rather than permission. See *id*. 572-73.

¶ 140 USP points to the following evidence that the prior owners of 220 Spring gave "permission" to use the curb cut: (1) Braun's testimony that she had "no problem" with HC using the curb cut; (2) Braun's answer of "yes" to USP's attorney's question as to whether she gave HC permission to use the curb cut; and (3) HC's attorney's January 3, 2018, letter, which provided that the original owner had "allowed" HC to use the curb cut. First, this court in *Schultz* held that evidence that the owner had "no problem" with the claimant's use is insufficient to establish permission. *Id.* at 572. Moreover, neither a lay witness nor an attorney can testify to a legal conclusion. See *McHale v. Kiswani Trucking Inc.*, 2015 IL App (1st) 132625, ¶ 98. As such, the trial court was not required to afford great weight to this evidence.

¶ 141 In addition, the cases that USP cites for the proposition that an extension of neighborly

courtesy is more consistent with permission than with adverse use are distinguishable. See *Deboe v. Flick*, 172 Ill. App. 3d 673, 676 (1988) (owner gave express permission); *Castle v. Yenerich*, 95 Ill. App. 3d 39, 44 (1981) (original use of the path was established by a person who was "like one of the family" and was continued by a person who had asked express permission); *Piper v. Warren*, 61 Ill. App. 2d at 464-66 (1965) (where two residential driveways abutted one another and the predecessors in title occasionally used each other's driveway but were overall careful to stay on their own side, the plaintiff's use of a portion of the neighbor's driveway was merely an extension of neighborly courtesy and did not show the plaintiff's adverse use). Clearly, *Deboe* and *Castle* are inapposite to the extent that they involve periods of use by express permission. *Piper*, and certain periods in *Castle*, provide examples of a more intimate neighborly courtesy—occasional use by residential neighbors or use by "one of the family"—than described in *Schultz* or than shown in the instant case.

¶ 142   Here, the trial court reasonably determined that Linda's use of the curb cut was in the character of one claiming the right to use the land rather than one acting according to the owner's permission to use the land. The evidence shows that Linda never asked permission to use the curb cut. She never wrote or spoke to the prior owners of 220 Spring about use of the curb cut. She never wrote or spoke to Braun at all. That the first owner of 220 Spring may have had a friendly personality and that Braun had "no problem" with HC's use of the curb cut and even waved a member of the Haight family into the lot, does not show permissive use *per se*. See *Schultz*, 148 Ill. App. 3d at 571-72. Thus, the court's alternate determination—that if the agreement did not contemplate use of the curb cut as an access point, then Linda simply claimed it as of right—was not against the manifest weight of the evidence.

¶ 143                            F. USP's Power to Terminate

¶ 144   USP argues that the trial court exceeded its authority when it ordered that "both parties are enjoined from altering, modifying[,] or terminating the easement without prior written agreement[] or leave of the court." USP contends that this order runs contrary to the termination procedure agreed upon by the original parties to the easement agreement as set forth in paragraph 7. Again, paragraph 7 provides:

"7. Breach.

(a) In the event of a breach of any of the provisions hereof by Grantee or its Permitted Users, which breach is not cured within 7 days following written notice thereof by the Grantor to the Grantee, or immediately upon the giving by the Grantor to the Grantee of the third notice in any consecutive twelve (12) month period of the occurrence of a breach hereof by Grantee, Grantor shall have the right, at its election to:

(i) *Terminate the rights of Grantee hereunder by recording a declaration of such termination with the office of the Recorder of Deeds of Kane County, Illinois*; or

(ii) Procure an order from any court of competent jurisdiction awarding Grantor damages incurred by reason of such breach and/or enjoining Grantee from any further breach of this Agreement." (Emphasis added.)

¶ 145   Paragraph 3 provides in relevant part:

"Grantor [USP, reserves the] *right to relocate* said Driveway Easement to such other locations on [its property] as [it] may determine[,] providing that such relocation does not materially deprive Grantee [HC] of access to the Entry Doors [onto the easement]."

(Emphasis added.)

¶ 146   USP notes that the court "cannot alter, change[,] or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson v. Gordon*, 241 Ill. 2d 428, 459 (2011).  Further, courts will not rewrite a contract to suit one of the parties.  *Schweihs v. Davis et al.*, 344 Ill. App. 3d 493, 499 (2003).  USP argues that the court did just that when it ordered that, contrary to the procedure set forth in paragraphs 7 and 3, neither party could terminate or relocate the easement without prior agreement or leave of the court.

¶ 147   HC argues, as it did at trial, that a contract should not be interpreted so as to defeat public policy or lead to an absurd result.  Indeed, the courts will not enforce a provision of a contract that is against public policy.  See *American Federation of State, County and Municipal Employees, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996); *In re Marriage of Iqbal*, 2014 IL App (2d) 131306, ¶ 34.  Public policy does not favor the termination of easements.  *McCann*, 242 Ill. App. 3d at 258.  Further, all contracts carry an implied covenant of good faith and fair dealing.  *Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 42.  The question of whether a party acted with good faith and fair dealing becomes particularly relevant when, as here, the contract vests one party with a great deal of discretion.  See *id.*; *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 367 (1995). "Good faith between contracting parties requires that a party vested with contractual discretion must exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."  See *Continental Mobile Telephone Co. v. Chicago SMSA L.P.*, 225 Ill. App. 3d 317, 324 (1992).  Courts have used the implied covenant of good faith and fair dealing as an interpretive tool.  See *Anderson v. Burton Associates*, 218 Ill. App. 3d 261, 267 (1991).  When used as an interpretive tool, the question is whether the actions of the defendant

were outside that contemplated by the parties such that the contract should not be interpreted to allow for such actions. *Abbott*, 249 Ill. App. 3d at 783. Finally, we are mindful that this case was decided in a court of chancery, with the dominant concern being equity. For the reasons that follow, we agree with the approach urged by HC and taken by the trial court.

¶ 148 The trial court reasonably determined that to allow USP to so easily terminate the agreement would be against public policy favoring the preservation of easements. The court witnessed first-hand USP's frivolous filings in USP's mid-trial fourth termination, and the court was free to conclude that USP used paragraph 7 "in a manner inconsistent with the reasonable expectations of the [original] parties." See *Continental Mobile*, 225 Ill. App. 3d at 324. In court's view, USP acted in a harassing manner and with an aim to terminate the easement rather than to cooperate. The court stated that USP's actions in blocking and terminating the easement were not justified and were merely to "frustrate and harass" HC.

¶ 149 The evidence supported the trial court's findings. Doree testified to an instance wherein Bogdan harassed her while she was shoveling snow. Doree attempted to shovel the easement when Bogdan stood in front of her snow blower and would not let her proceed. He spontaneously declared the easement relocated. USP also placed concrete barriers and/or a fence with a locked gate across the same curb cut area. Doree testified that USP blocked in vendor vehicles after they were already in the easement and that, in one instance, she had to call the police to allow the vendor to exit.

¶ 150 As the trial court found, USP recorded terminations without fair attempts to problem solve with HC. USP filed its first termination based on HC's alleged failure to deposit proof that it maintained an insurance policy naming USP as an additional insured. As discussed, it did so near two major holidays and without placing a phone call to see whether HC planned to respond to its

written notice. USP filed its second termination based on the allegedly lewd actions of HC's guests. USP had not complained of these actions in the four years prior, supporting the trial court's finding that USP acted with an aim to terminate the easement rather than cooperate. USP filed its third termination concerning an alleged ADA violation, the evidence of which was ultimately barred. USP filed its fourth termination concerning an alleged Fire Code violation during the instant trial, prompting the trial court to note: "The Staneks' animus for their neighbors is so pronounced that Mrs. Stanek attempted to serve a new notice of termination upon HC during the trial."

¶ 151   Under these circumstances, the trial court properly interpreted the agreement in an equitable manner consistent with public policy, in avoidance of an absurd result, and so as to prevent further abuse by USP.

¶ 152                               G. Cross-Appeal: Attorney Fees

¶ 153   In its cross-appeal, HC contends that the trial court erred in interpreting the contract to allow for the indemnification provision to cancel out the fee-shifting provision. Again, the court entered a two-part order, the second part of which effectively canceled out the first:

> "D. Pursuant to paragraph 9 of the easement [agreement], [HC], as the prevailing party, are awarded their reasonable attorney fees incurred by them to prosecute this action.
>
> ***
>
> F. Regarding [USP's] [request for] indemnification [based on paragraph 8 of the easement agreement], the court finds that, pursuant to its equitable powers, [USP] is entitled to reimbursement from [HC] for the full amount of any judgement for [HC's] attorney's fees entered against [USP] in accordance with paragraph D above. Apart from that, parties to [bear] their own costs."

The trial court reasoned elsewhere in its decision:

> "USP *** seeks indemnification pursuant to paragraph 8 of the easement. Paragraph 8 does provide USP defense and indemnification for 'any and all liability and expense' arising in 'connection with the use or enjoyment by [HC]' of the easement. However, requiring HC to fully defend and indemnify USP in an action brought by HC [against USP] to enforce its rights to the easement would be counterintuitive and inequitable. Besides, had USP actually wanted such defense, they should have tendered the claim to HC's insurer. They did not. Nevertheless, that does not necessarily resolve the issue. The language in paragraph 8 is broad and all encompassing. Certainly, the court should have discretion to apply paragraph 8 equitably. Such as offsetting any monetary judgment suffered by USP herein."

¶ 154   The general rule is that each party pay its own attorney fees. *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001). Parties to a contract may alter the general rule by including a fee-shifting provision. *Id.* Fee-shifting provisions are strictly construed and enforced at the discretion of the trial court. *Id.* The trial court has broad discretion in awarding attorney fees. *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29. A trial court abuses its discretion when its decision is based on a misapplication of law or when no reasonable person would take its view. *In re Marriage of Burns and Lifferth*, 2019 IL App (2d) 180715, ¶ 24; *Grizzle*, 398 Ill. App. 3d at 646.

¶ 155   We first determine that the fee-shifting provision entitles HC to attorney fees. Paragraph 9(c) of the easement agreement provides:

> "(c) in any action or proceeding between the parties arising out of or in connection with this Agreement or the breach or enforcement thereof, the party prevailing in such

proceeding shall be entitled to recover his/its costs and expenses (including *reasonable* attorney fees) from the non-prevailing party." (Emphasis added.)

¶ 156   In the context of a fee-shifting provision, the "prevailing party" is one who is successful on any significant issue and achieves some benefit in bringing the suit. *Timan*, 2012 IL App (2d) 100834, ¶ 29. The prevailing party need not win every single issue, nor receive the full judgment amount requested. *Id.* When a case involves multiple claims and both parties have won and lost on various claims, such that the case is essentially a "draw," it may be inappropriate to award attorney fees. *Powers*, 326 Ill. App. 3d at 515.

¶ 157   *Timan* and *Powers* together illustrate the bounds of a trial court's discretion in applying a fee-shifting provision. In *Timan*, the plaintiff prevailed on a significant issue, its breach of contract claim. *Timan*, 2012 IL App (2d) 100834, ¶ 30. The plaintiff did not prevail on a second significant issue, its recission claim (an equitable remedy). *Id.* The trial court determined that the plaintiff nevertheless qualified as a prevailing party. *Id.* It did, however, limit the plaintiff's attorney fee award to 40% of that requested, specifically acknowledging that plaintiff had not prevailed on the recission issue. *Id.* The appellate court deemed the trial court's approach reasonable and affirmed the award. *Id.*

¶ 158   In *Powers*, the landlord prevailed on one issue, involving the tenant's damage to property. *Powers*, 326 Ill. App. 3d at 514-15. The trial court valued the damage at $875. *Id.* The landlord did not prevail on any of its other claims, one of which was the tenant's alleged environmental contamination. *Id.* The trial court nevertheless deemed the plaintiff the prevailing party and awarded the plaintiff $37,918 pursuant to the fee-shifting agreement. *Id.* at 515. The appellate court reversed the fee award, explaining:

> "Although plaintiff successfully obtained a judgment for damages resulting from

the installation of pay telephones, this issue was not significant relative to either the value of the remaining claims, their complexity, or the time devoted to the other issues at trial. When value, complexity, and time are considered, the most significant issue was the environmental contamination. However, the trial court's ruling on this issue did little more than maintain the status quo. Defendant prevailed on the remaining issues. Therefore, we determine that the trial court abused its discretion when it determined that plaintiff was a prevailing party for the purposes of a fee-shifting agreement. [Citation.] Because plaintiff did not prevail on a significant issue, he was not entitled to any attorney fees." *Id*. at 517-18.

¶ 159 Here, like the plaintiff in *Timan* and unlike the plaintiff in *Powers*, HC prevailed on significant issues. The trial court's findings favored HC overall: USP was ordered to remove barriers to the easement, USP's recordings of termination were declared null and void, the easement was preserved, the entrance route over the curb cut was preserved, and USP was prohibited from unilaterally terminating the easement in the future. We acknowledge that USP enjoyed small victories: the court ordered that HC pay to complete the fence line from the east wall of its building to the western edge of USP's existing fence, and the court noted that this should help solve the one remaining problem that HC had, as of yet, failed to remedy—trespassers using the easement to urinate and vomit. However, per *Timan*, that the court has criticized or ruled against HC on these smaller points speaks not to HC's entitlement to a fee award but to the reasonableness of the fee award.

¶ 160 We next determine that the indemnification provision does not cancel out the fee-shifting provision. Paragraph 8 of the easement agreement provides:

"8. Indemnification. Grantees for itself and its successors and assigns (collectively

the 'Indemnitors') does hereby agree to forever indemnify, defend, and hold Grantor, Grantor's heirs, successors and assigns (collectively the 'Indemnitees') harmless from and against any and all liability and expense (including reasonable attorney's fees) incurred by Indemnitees and arising out of or in connection with any claim, demand, suit, or other action for any injury, loss or damage alleged to have occurred as a result of or arising in connection with the use or enjoyment by Grantee or Grantee's Permitted Users of a Driveway Easement on Parcel C.  Grantee shall at all times maintain with a reputable insurance company licensed to do business in the State of Illinois a policy or policies of insurance insuring against liability for personal injury or property damage having a combined single limit of $1,000,000: such policy of insurance shall expressly name indemnitees as additional insureds and proof thereof (and of all renewals thereof) shall be deposited with indemnitees."

¶ 161   The court has a duty to harmonize a contract's various provisions and will not read one provision so as to render another provision superfluous. *Standlee*, 2019 IL App (2d) 180325, ¶ 55. In this case, if paragraph 8 were read to provide a basis to cancel out the attorney fee-shifting provision in a suit between the parties, then the fee-shifting provision would be rendered superfluous in all suits in which HC prevails.  HC, if ever it prevailed in a suit against USP so as to be awarded attorney fees, would be subject to indemnify USP for that same fee award.  We cannot read paragraph 8 in this manner.

¶ 162   Even the trial court recognized that, technically, the paragraph 8 indemnification provision could not be applied to require HC to indemnify USP for the very attorney fees that USP had been ordered to pay to HC.  The court acknowledged that this would be "counterintuitive and inequitable."  Moreover, USP had not invoked the indemnification clause by tendering a claim to

HC's insurer. Indeed, it would seem to us that the indemnification provision was more suited to personal injury or property damage claims filed by a third party, not an action in equity to determine the rights between the parties to an easement agreement. No, it appears that the trial court looked to the indemnification clause as a source of equity and discretion when awarding attorney fees. However, equity and discretion are already the starting point when considering attorney fees. See, *e.g.*, *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991). And, the fee-shifting provision here already allows only reasonable fees: "[T]he party prevailing in such proceeding shall be entitled to recover his/its costs and expenses (including *reasonable* attorney fees) from the non-prevailing party." (Emphasis added.) Thus, to whatever degree the court was reluctant to award attorney fees generated by conflicts in which HC was not wholly blameless (such as its guests' behavior and the completion of the fence), the fee-shifting permits it to do so.

¶ 163   USP's arguments to the contrary do not persuade us. USP essentially argues that HC was not, in fact, the prevailing party. For the reasons stated, *supra* ¶ 159, this argument fails. USP also stresses that, in general, the trial court is afforded great discretion in issuing attorney fees. However, neither this court nor HC disagrees with this point. See, *e.g.*, *Callahan*, 144 Ill. 2d at 43-44. In fact, as we have recognized, the instant proceedings have occurred in chancery, a venue which elevates the equitable powers of the court.

¶ 164   Nevertheless, the trial court abused its discretion by misinterpreting the contract to allow for the indemnification provision to cancel out the fee-shifting provision. The original parties to the agreement chose to include a fee-shifting provision, and the trial court may not simply disregard it. It is only with great caution that a court of equity may reform a contract, and it may do so only to correct a mistake where there is no doubt as to the original parties' intent. See *Kolkovich v. Tosolin*, 19 Ill. App. 3d 524, 528 (1974). Here, there is no indication that the original

parties included the fee-shifting provision by mistake. In fact, the fee-shifting provision serves to chill the very behavior for which the trial court chastised USP—unjustified allegations of breach, which, in mass, have amounted to harassment. While the fee-shifting provision controls the question of attorney fees in a lawsuit between the parties, the trial court is not necessarily required to award the prevailing party the whole of its attorney fees. We remand the cause for the trial court to determine a reasonable fee award.

¶ 165                                III. CONCLUSION

¶ 166   For the reasons stated, we affirm the trial court's ruling on the issues pertaining to USP's appeal. We reverse the trial court's decision as to attorney fees and remand for the trial court to determine HC's reasonable fee award.

¶ 167   Affirmed in part; reversed in part and remanded.