# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Timan v. Ourada*, 2012 IL App (2d) 100834

---

| | |
|---|---|
| Appellate Court Caption | CHRIS TIMAN and TERESA TIMAN, Plaintiffs-Appellants and Cross-Appellees, v. PAUL OURADA, Individually and d/b/a GQ Quality Construction, Defendant-Appellee and Cross-Appellant (Mellen Septic Services, Inc., ReMax Advantage Realty, Larry Fales, and Ticor Title Insurance Company, Defendants). |
| District & No. | Second District<br>Docket No. 2-10-0834 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | May 22, 2012<br><br>June 27, 2012<br>June 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant builder breached his contract by failing to provide a functioning septic system for the new house he built for plaintiffs, and even though defendant prevailed on the rescission, consumer fraud and warranty of habitability counts in their complaint, the trial court did not abuse its discretion in awarding plaintiffs 40% of their attorney fees plus costs, since the breach-of-contract issue was significant, it was contested and damages in an amount needed to replace the system were awarded. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-L-227; the Hon. Raymond J. McKoski, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | No brief filed for appellants. |
| | John L. Quinn and John W. Quinn, both of Churchill, Quinn, Richtman & Hamilton, Ltd., of Grayslake, for appellee. |
| Panel | PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion. |
| | Justices McLaren and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Paul Ourada, appeals from the trial court's judgment, following a bench trial, in favor of plaintiffs, Chris and Teresa Timan, on their breach-of-contract claim and the court's ruling on the parties' attorney fee petitions.[1] We affirm.

¶ 2                                     I. BACKGROUND

¶ 3    On April 27, 2007, plaintiffs purchased from Ourada, a general contractor, a new three-bedroom home at 20560 West Lakeview Avenue in Lake Villa for $305,000. Soon after the septic system was installed, raw sewage began seeping into the front yard. Plaintiffs subsequently filed a five-count complaint against defendants, four of which counts were pursued at trial against Ourada: rescission (count I); violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2008)) (count II); breach of warranty of habitability (count III); and breach of contract (count IV).

¶ 4    The trial evidence reflected that, at the time of closing on plaintiffs' home purchase, a septic field, which was going to be installed in plaintiffs' front yard, had not yet been installed, because the installation area was wet. The parties agreed that plaintiffs could move into the home before the septic installation was completed. When they moved in on April 27, 2007, only the three concrete holding tanks were installed.

¶ 5    About May 9, 2007, the septic system installation was completed. Soon thereafter, plaintiffs experienced problems with the system. By May 28, 2007, the septic system began leaking raw sewage onto the driveway and, from there, to a road ditch. Chris Timan noticed

_____

[1]Because plaintiffs did not file an appellants' brief in this appeal, we address only the issues Ourada raises in his cross-appeal.

raw sewage, which had an odor, when he was digging on the west side of the driveway (the septic field was east of the driveway and in the front yard). This sewage flowed to an area behind the house. On another occasion, when he was digging on the east side of the driveway, Chris noticed raw sewage flowing down the driveway and into a ditch. Chris installed a retaining wall (at the suggestion of a county employee) to prevent water from running down the driveway and into the ditch. This resulted in the water staying or sitting in the septic area, which, according to plaintiffs, has been constantly wet since the wall installation. Ourada testified that he had conversations with Bill Mellen, whom he had hired to install the septic system, and the health department to ascertain the cause of the problem and to come to a solution. Ourada, Mellen, and health department personnel suggested to Chris that use of the expansion field was an option, as did Greg Nerroth, a septic contractor whom Chris had contacted. Nerroth also suggested using the fields on alternating bases.

¶ 6    Chris testified that, on or about September 25, 2007, Ourada told him that the expansion field was the only option the health department would allow. Chris told Ourada that this option was not acceptable. Plaintiffs rejected using the expansion field because, when they purchased the home, they planned on using the expansion 20 years later or if certain problems arose in the future. Chris testified that, although using the expansion field now might be a solution to the current problem with the system, it is not a "fair" solution and deprives plaintiffs of the option of having another field available in the future should another problem arise. Plaintiffs have reduced their water usage and delayed expanding their family.

¶ 7    Some of the trial testimony addressed plaintiffs' allegations that Ourada hid from them and others the fact that there was a wetland on the property. The testimony also addressed the communications between the county health department (which issues septic permits) and the planning department (which issues building permits and assesses wetland issues). More than one year before he constructed plaintiffs' home, the wetland issue was brought to Ourada's attention by the planning department after he had applied for a site development permit. Prior to the installation of the septic system, Ourada was in the process of obtaining a fill permit from the Army Corps of Engineers to remove the property from a delineated wetland. Daniel Krill, a planning department wetlands specialist, had examined the property, and the planning department contacted Ourada about Krill's observation of a possible wetland. In February 2006, the county notified Ourada that he was required to obtain a wetland delineation report (which he obtained on April 27, 2006, from Hey & Associates and which delineated a wetland in the front yard). He could not recall if he showed it to plaintiffs. Ourada purchased the property after the report was prepared and after he was assured of obtaining a building permit. On June 21, 2006, the Army Corps of Engineers authorized Ourada to fill 0.06 acres of wetland located at the property address; this was a condition of obtaining a building permit. Ourada stated that he did not fill the wetland area. Ourada testified that he had no prior experience with wetlands on properties on which he had built homes. On June 7, 2007, after Mellen installed the system, the health department issued a certificate of approval for it.

¶ 8    Krill testified that he examined plaintiffs' property on March 16, 2006, and determined that there was a wetland on the property. The primary factor leading to this conclusion was the presence of wetland-adapted vegetation (*i.e.*, the presence of vegetation that exists only

when wetland conditions are present). Krill did not observe standing water or saturation when he inspected the property. Krill next contacted the Army Corps of Engineers, and it was subsequently determined that the Army Corps had jurisdiction. Krill explained that, at this point, his role ended. Krill explained that a property could lose wetland characteristics by being drained or filled in. Krill again inspected the property in February 2009. On this date, Krill concluded that the area was *no longer a wetland*, because the property had been modified by the construction of the house, the absence of wetland vegetation (*i.e.*, the visible vegetation was a manicured lawn), and changed hydrology. Krill disagreed with Ourada's testimony that no fill was placed on the wetland.

¶ 9 Plaintiffs claimed that Ourada never informed them that their property contained a wetland, and they asserted that they never would have purchased property with a wetland (even if it had been filled in). Teresa Timan testified that Mellen told her that the lot was barely buildable, or ".2 on a buildable scale." She also stated that health department personnel told her that the soil test showed that the soil "was at the least buildable number." Plaintiffs added 15 loads of top soil to the front of their property, primarily around the peat filters and on the septic field, and near the back of the property to fill in around new sidewalks. Chris testified that very little of the soil they added to their property was spread on the septic field.

¶ 10 Preston Rea, an environmental consultant, testified on Ourada's behalf that he conducted an operational analysis of plaintiffs' septic system. He visited the property on April 22, 2009, and observed water discharging on the ground at the east side of the seepage bed. He also observed that the bed's gravel was saturated above the stone that was in the bed. Subsequent testing led Rea to conclude that there was a direct connection from the toilet in the residence to the discharge that was occurring in the yard. Thus, there was a hydrologic failure of the system.

¶ 11 Gloria Westphal, who worked between 2005 and 2007 for the section of the county health department that reviewed septic plans, testified that she is also a certified professional soil classifier. She first saw plaintiffs' septic plans at about the time the system was installed and first became aware that the site contained a wetland *after* the plans were approved and the house was under construction. Before the plan review, the health department should have been made aware that the area was delineated as a wetland. If there was a wetland, "it should have been included on the [septic] drawings." Department rules provide that, where there is a delineated wetland, there must be a 50-foot setback between the septic field and the wetland. The department relies on information that applicants provide on their drawings and relies on it to be truthful. Although variances are allowed, they are not routinely granted. The installation of the septic field within a delineated wetland was a violation of county ordinance. Westphal further testified that most soils in wetland areas are not suitable for septic systems. She viewed plaintiffs' system three or four times and classified it as failing. If Westphal had found out that there was a delineated wetland on plaintiffs' property after the permit had been issued, she would "have taken another look" at the permit issuance. If she had known of the wetland before the permit was issued, she would not have allowed it to issue.

¶ 12 Addressing expansion fields, Westphal explained that they are used when there is a

problem with a septic system and there is a need for a replacement. A septic system has a limited life expectancy (about 20 to 40 years), and an expansion field is required so that the system can be replaced. Westphal did not approve plaintiffs' septic system, but signed off for Jeff Bixler, who was on vacation. The plan was approved on July 6, 2006, about one year before installation was completed. The soil tests reflected that the soil was suitable for the installation of a septic system. After the problems arose with the system, Westphal reviewed the health department's file on plaintiffs' property and she did not find any mention of a delineated wetland. Westphal further testified that no definitive conclusions have been made as to the cause of the septic system's failure. Westphal believed that the expansion field was an option and would allow the primary field to dry out.

¶ 13       Mellen testified that he is aware that a septic system may not be installed on a wetland. He maintained that he was aware that there was a *potential* wetland on the property; however, the county ultimately approved his septic plan and, so, he assumed that there were no issues with the property. Once plaintiffs' septic system began to malfunction, Mellen had discussions with health department personnel to find a solution. Although he has several suggestions, Mellen is not certain that any of them will correct the issues with the septic system. Mellen testified that modifying the system to use the expansion field would cost about $6,000.

¶ 14       Greg Nerroth, an excavating and septic installer, testified that he visited plaintiffs' property at plaintiffs' request in July 2007 and observed leaking fluid in the southeast corner. He dug holes to measure the water level. One week later, he returned to make further observations. At one point, he also installed a water meter and spoke to health department personnel. Nerroth has installed between 250 and 300 septic fields. On new construction (such as plaintiffs' home), he has used an expansion field on only one occasion. Nerroth opined that one potential solution for plaintiffs' system is to break up the expansion field so that one side at a time takes in water while the other side has a chance to dry. This potential solution would use the entire primary field and all of the expansion field. This option was discussed with county officials and Mellen. At the time of the meeting, the entire primary field was receiving effluent. In discussions with county officials, no one ever mentioned to Nerroth that plaintiffs' septic system was installed on a wetland.

¶ 15       Jeffrey Bixler works for the health department and approved plaintiffs' septic permit. He reviewed the soil test results and determined that the soils were suitable for construction of a septic system on plaintiffs' property. Bixler approved the system before the house was built on the property and *after* the Army Corps informed him that there was a wetland on the property. Bixler testified that he is not a wetland expert. Krill serves that function for the county. Bixler's office's custom when there is a wetland issue is to refer it to site development (where Krill works). The health department holds off on issuing any permit until it "hear[s] from" site development. In March 2006, Bixler spoke to Krill about the wetland issue on plaintiffs' property. Bixler stated that a wetland was not depicted on any plan he reviewed. Krill told him that he inspected the property and that, although it showed "some signs of a wetland," it was "okay for us to issue our permits." Bixler ultimately approved the permit.

¶ 16       Addressing the repair issue, Bixler testified that he believes that plaintiffs' system can

be repaired by installing another system in the expansion field. However, he also testified that he does not know what caused the problems. After the problems arose, Bixler visited the property and conferred there with other members of the health department and Mellen. Soil tests reflected that the soils in the expansion field are suitable for a waste water system. Bixler testified that, if the expansion field did not work, a holding tank would be another option.

¶ 17    The trial court found in Ourada's favor on plaintiffs' claims for rescission (count I), consumer fraud (count II), and implied warranty of habitability (count III). However, the court found that Ourada breached his contract with plaintiffs by failing to provide an operable septic system, as he had contracted to do.[2]

¶ 18    The damages testimony was as follows. Roy Evans, an engineer with experience working as a municipal health officer and building commissioner, testified that he has designed over one dozen septic systems and examined (and redesigned to work) failing ones. Evans reviewed various documents and testimony in this case and inspected plaintiffs' property. He opined that use of the expansion field would limit the system because it would not be available for future use. Evans suggested removing the existing field because the soil was likely compacted by heavy vehicles. Replacement of the compacted soil with a granular material would alleviate the problem. Excavation would also permit inspection of the ground under the field to determine if an underground spring or pipe was the source of the flooding. Evans estimated that the cost to create a functioning septic system on plaintiffs' property would be $36,500.

¶ 19    Natalie Karney, president and director of an engineering firm and health officer for a municipality, testified that her firm designs most of the septic systems in the area. Karney estimated that the cost of expanding the septic system into the expansion field would be $6,300. Karney is unaware if the expansion field area is still a wetland. Her estimate is based on soil data that did not indicate that there was a wetland in that area. Karney testified that she is unaware if her proposal would result in a functioning septic system.

¶ 20    The trial court awarded plaintiffs $36,500 in damages and found that Ourada was entitled to a setoff for the amount that the settling defendants (*i.e.*, Larry Fales, ReMax Advantage Realty, and Ticor Title Insurance Company)[3] paid to plaintiffs. Addressing attorney fees, the parties stipulated that: plaintiffs incurred $42,750 in fees and $7,293.54 in costs; and Ourada's fees were $43,585. Plaintiffs noted that their purchase contract with Ourada provided that the successful party in the litigation is entitled to collect reasonable attorney fees and costs from the losing party as ordered by a court of competent jurisdiction. The trial court found that plaintiffs were the prevailing/successful party in the litigation because they proved a breach of contract and damages as a result. However, the court further found that

---

[2]As to plaintiffs' warranty of habitability claim (count V) directed against Mellen, the court found in favor of Mellen.

[3]ReMax and Fales were the realtors who arranged the sale of the Lakeview property to Ourada and the sale of plaintiffs' former residence.

no amount would be awarded for the rescission count, because it "was lost and did not have much of a chance of prevailing, if you ask me." The court determined that 40% of what was claimed was a reasonable fee amount and, thus, awarded plaintiffs $17,422 in attorney fees (plus $7,293.54 in costs). Accordingly, it denied Ourada's petition for fees and granted plaintiffs' petition in the aforementioned amounts. Ourada appeals.

¶ 21                                    II. ANALYSIS
¶ 22                               A. Breach of Contract
¶ 23        Ourada argues first that the trial court erred in finding that plaintiffs established a breach of contract for failure to provide a properly functioning septic system. He argues that, by rejecting his suggestion to use the expansion field, plaintiffs prevented his performance of the contract and, therefore, his performance is excused. Ourada first asserts that the contract does not prohibit the use of the expansion field; indeed, it does not mention it at all. He reasons that there is no justification for plaintiffs' refusal to allow the use of the expansion field to repair the septic system. Second, Ourada points to trial testimony by Bixler, Westphal, and Nerroth that the very purpose of an expansion field is to be a backup for a primary field's failure. Ourada argues that it would not offend the workmanlike standard (specified in the contract) to use the expansion field to correct the septic problem and that the testimony showed that this is its purpose. Thus, he concludes, there is no justification for plaintiffs' refusal to allow its use and, because they prevented him from doing so, he is excused from performance and there is no breach. We reject Ourada's argument.

¶ 24        We review *de novo* the interpretation of a contract. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). Whether a breach of contract occurred, however, is a question of fact, and the court's finding will not be disturbed on appeal unless it was against the manifest weight of the evidence. *Covinsky v. Hannah Marine Corp.*, 388 Ill. App. 3d 478, 483 (2009). "The elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Henderson-Smith & Associates, Inc. v. Nahamani Family Service Center, Inc.*, 323 Ill. App. 3d 15, 27 (2001).

¶ 25        We first disagree with Ourada that the parties' contract allowed for the use of an expansion field. Ourada claims that, if the contract did allow for it, then plaintiffs prevented Ourada's performance and cannot maintain a cause of action for breach of contract. See, *e.g.*, *Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 966 (1981) ("A party to a contract may not complain of the nonperformance of the other party where that performance is prevented by his own actions."). We reject this claim. The contract does not define "septic system." We conclude that the term is ambiguous. Considering extrinsic evidence to ascertain its meaning (*CFC Investment, L.L.C. v. McLean*, 387 Ill. App. 3d 520, 527 (2008)), we further conclude, based upon the trial testimony, that an expansion field is not customarily used when a new septic system is installed and that, therefore, without any specific reference in the contract to such a field, the common meaning of "septic system" does not encompass its use in new construction.

¶ 26        Next, we reject Ourada's argument that the evidence established that use of the expansion

field would have been a reasonable solution and that plaintiffs thus prevented Ourada's performance. Although several witnesses testified that an expansion area is used when a primary septic area does not function properly, they also testified that this is not done in a new installation. Westphal, a health department employee, testified that septic systems have limited life expectancies (*i.e.*, 20 to 40 years) and that expansion fields are used as replacements thereafter. Similarly, Nerroth testified that he has installed between 250 and 300 septic systems and that on only one new-construction occasion did he use an expansion field. As to the key issue, whether use of the expansion field would have solved the flooding problems, the evidence was sufficient to establish that it was uncertain if it would do so. Westphal testified that use of the expansion field was an option, but conceded that no definitive assessment has been made as to the cause of the system's failure. Bixler, a health department employee, also identified the expansion field (and, if that failed, a holding tank) as an option, but conceded that he did not know the cause of the system's failure. Given the lack of any testimony as to the cause of the system's failure and the overwhelming testimony that expansion fields are not routinely used in new construction, we cannot conclude that it was against the manifest weight of the evidence for the trial court to find that plaintiffs did not prevent Ourada's performance and to further find that Ourada breached his contract by failing to provide a functioning septic system.

¶ 27                                  B. Attorney Fees

¶ 28        Next, Ourada argues that the trial court erred in awarding plaintiffs attorney fees, because he was successful on the primary issues in dispute. Ourada claims that, because he prevailed on the consumer fraud, rescission, and warranty of habitability counts, he should recover the costs of litigating this case. Ourada asserts that the rescission count was the most significant count. He claims that this count provided incentive for plaintiffs to reject Ourada's offer to pay to fix the septic system. Ourada urges that the trial court's award places him in the unjust position of having to "finance [plaintiffs'] failed long shot claims." We reject Ourada's argument.

¶ 29        A trial court has broad discretion in awarding attorney fees, and its decision will not be reversed on appeal absent an abuse of discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991). "A party can be considered a 'prevailing party' for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit [citation], receives a judgment in his favor [citation] or by obtaining an affirmative recovery." *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill. App. 3d 737, 753 (1992). "To qualify as a prevailing party, a plaintiff must succeed in obtaining some relief from the defendant against whom attorney fees are sought." *Community Consolidated School District No. 54 v. Illinois State Board of Education*, 216 Ill. App. 3d 90, 94 (1991). "A successful litigant is still considered the prevailing party under a fee-shifting provision even if the judgment amount is below the amount claimed." *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001); see also *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d 677, 687-88 (1994) (in action where homeowners sued home-building contractor for breach of warranties, trial court did not abuse its discretion in awarding homeowners attorney fees on all of their claims pursuant to

contractual fee-shifting provision; even though court did not award the homeowners damages for all of the defects alleged in their complaint, the "better approach" is that there is only one prevailing party and homeowners met the criteria). "However, when the dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party and an award of attorney fees to either is inappropriate." *Powers*, 326 Ill. App. 3d at 518 (in a case where a commercial landlord sued a commercial tenant to enforce a lease, the trial court abused its discretion in awarding attorney fees to the landlord, where the landlord "did not prevail on *a significant issue*" (emphasis added)); see also *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 861 (2000) (where former employer sued former employee for breach of contract, trial court's determination not to award attorney fees was affirmed, because both parties were successful on significant issues in the case; the plaintiff received a judgment that the defendant breached the agreement, and the defendant succeeded on the damages claims–the plaintiff failed to prove any actual damages).

¶ 30        Here, the parties' contract contains a fee-shifting provision that provides that the prevailing or successful party in any litigation is entitled to reasonable attorney fees and costs from the losing party. Plaintiffs obtained a judgment against Ourada on their breach-of-contract claim. In announcing its ruling on attorney fees, the trial court noted that no amount would be awarded with respect to the rescission count, upon which plaintiffs did not prevail. Although we do not disagree with Ourada's argument that the rescission count (which was premised on allegations that Ourada committed fraud in that the soil was unbuildable and that a wetland existed on the property) was a significant issue in this case, it was not the only significant issue. As to the breach-of-contract count, the septic system's failure was not stipulated to and testimony was elicited on this issue. Further, it remains that plaintiffs prevailed on the breach-of-contract count and that damages were awarded on this claim–damages in an amount that their expert testified would be needed to replace the septic system. The trial court did not ignore that plaintiffs failed to establish that they were entitled to rescission, as it specifically acknowledged this and awarded only 40% of plaintiffs' claimed fee amount. This finding was not unreasonable and, thus, we find no abuse of discretion with the court's fee award.

¶ 31                                    III. CONCLUSION
¶ 32        For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 33        Affirmed.