NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250478-U

NO. 4-25-0478

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 7, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CRAIG HART, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Rock Island County |
| MD RACING, INC., an Illinois Corporation, | ) | No. 24SC1851 |
|     Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Clayton R. Lee, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Grischow and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgment in favor of defendant in
which the trial court concluded, after a bench trial, that plaintiff had failed to
prove his case by a preponderance of the evidence.

¶ 2    In November 2024, plaintiff, Craig Hart, filed a small claims complaint against

defendant, MD Racing, Inc. (MD Racing), alleging that MD Racing breached a service contract

to repair Hart's motorcycle. After a bench trial, the trial court found in favor of MD Racing,

concluding that Hart failed to meet his burden of proof.

¶ 3    Hart appeals, arguing the trial court erred by (1) failing to consider various

provisions of the Automotive Repair Act (815 ILCS 306/1 *et seq.* (West 2022)) and (2) finding

he did not meet his burden of proof when he showed that MD Racing performed repairs that

were not listed in the contract and overcharged for those repairs. We disagree and affirm.

¶ 4                            I. BACKGROUND

¶ 5                    A. The Complaint

¶ 6         In November 2024, Hart filed a small claims complaint against MD Racing, alleging that MD Racing overcharged and performed unauthorized repairs pursuant to a service contract to repair Hart's motorcycle. Hart further alleged that MD Racing's repairs did not meet "workmanlike standards," requiring Hart to pay a different repair shop to put the motorcycle in working order. Hart specified which services were performed that he did not authorize, as well as which parts and labor he believed were unnecessary and overpriced, although he did not state by how much. Hart claimed MD Racing owed him $3,543.49 in damages.

¶ 7         Hart attached a copy of the service contract to the complaint. The contract was dated March 15, 2022, and was signed by both Hart and Matt Drucker, who signed as president of MD Racing. (We note that Drucker appeared in court on behalf of MD Racing, as authorized by Illinois Supreme Court Rule 282(b) (eff. Jan. 1, 2018), and proceeded *pro se* throughout the proceedings.)

¶ 8         The first section of the contract provided, "Subject to the terms and conditions herein, [MD Racing] agrees to provide motorcycle service and or repairs as fully described on Exhibit A (the 'Services')." Exhibit A appeared immediately after the signature lines and contained handwritten notes that provided as follows:

> "Description of the Work & Documentation of work
>
> Bike does not run with any throttle
>
> Clean carbs—replace parts as needed
>
> Carbs may have sticky floats
>
> ***
>
> take a look coolant rese[r]voir tank

Customer is going to take care of a front brake caliper issue

get new plugs"

The contract also included (1) a limited 30-day warranty, (2) an integration clause, and (3) a no oral modifications clause.

¶ 9                                      B. The Bench Trial

¶ 10         In February 2025, the trial court conducted a bench trial on Hart's complaint. The parties waived opening statements.

¶ 11                                 1. *Plaintiff's Case-in-Chief*

¶ 12                                    a. John Babb

¶ 13         John Babb testified that he was a technician for Brenny's Motorcycle Clinic (Brenny's), a motorcycle repair shop in Bettendorf, Iowa, and he had worked there since March 1996. Babb performed repair work on the carburetors of Hart's motorcycle and identified two photos he took of those carburetors while performing those repairs, which were admitted into evidence without objection.

¶ 14         According to Babb, the first photo showed "[t]he internal workings of a half a rack of carburetors," specifically, "[t]he bottom side of a carburetor for a V-Max." Babb testified that the green stains and residue on the carburetor parts should not be there and would not be there after an ultrasonic bath to clean the parts. Babb explained that the stains and residue were caused by bad fuel or fuel additives. When asked how long it would take for the green stains and residue to come back after being cleaned, Babb answered, "It depends on the state of the fuel." He continued, "I've seen carbs go bad in a matter of weeks depending on the state of [the] fuel."

¶ 15         The second photo showed "a pair of motion tubes from the carburetors," one that Babb had cleaned and one that he had not cleaned. Babb testified, as follows:

"[I]t struck me as strange that they were kind of fuzzy. Again, I don't know how long. I mean, I'm not sure of the time frame. I know the job came to us with a bike that ran poorly, and I was given permission to do a carb clean. And, like [I] said, I don't know when it was done last, and I don't know the time frame to when I did it."

¶ 16　Babb identified an invoice for the work he performed on Hart's motorcycle dated November 15, 2023, charging $1,006.55 in total for the parts and labor. The cost of the labor was $800 for servicing the carburetors and performing the required "carb sync" afterwards. The invoice was admitted into evidence.

¶ 17　Babb testified that the repair work was necessary because the bike ran poorly when he started it. He removed four carburetors, and all four had the same stains and residue problems. Babb described the process involved in cleaning the carburetors and stated the process takes at least five hours. He also stated that the parts appeared to be "factory original" or "stock."

¶ 18　On cross-examination, Drucker asked, "[T]hroughout the whole course of your interaction with the motorcycle from start to when you were done with your job, did you see any previous defects of workmanship?" Babb answered, "No. As far as physicality, no." Regarding the green substance and varnishing, Babb agreed that it was possible that from April 2023, when Hart picked up his motorcycle, and November 2023, when Babb worked on it, there was enough time "for the carbs and the fuel to go bad and varnish up and clog passages." Babb elaborated, "[E]specially if the fuel was left—the fuel being the same from when the original carb clean was done." He continued, "Depends on the status of the fuel. Like I said, I've seen carbs that I've cleaned go bad in a matter of weeks. Not necessarily of this nature and style, but, yeah, depending on the state of the fuel."

¶ 19       In Babb's opinion, if a motorcycle was to be stored for a prolonged period of time, he recommended that the motorcycle be started and run for around 10 to 15 minutes every two weeks or so. If that was not possible, the tank should be filled and the carburetors drained. When asked, "Did it look like the carburetors had been drained?" Babb answered, "There is no way for me to definitely tell you that with the exception that the carburetors were fuzzy and dirty. So that gave me the impression that they were not stored properly."

¶ 20                           b. Craig Hart

¶ 21       Hart testified that he owned two motorcycles, including the 1994 Yamaha V-MAX at issue. He took that motorcycle to MD Racing for repairs and signed a "service/repair contract" with them, a copy of which was admitted into evidence. Hart was having difficulty with the throttle, which would cause the engine to die when he increased revolutions per minute (RPMs) from idle.

¶ 22       Hart believed the problem arose from a carburetor issue and took it to MD Racing for repairs on March 15, 2022, the same day he signed the contract. Hart explained that when he dropped off the motorcycle, he asked MD Racing to clean the carburetors and MD Racing gave him a quote of around $1,500. MD Racing later recommended replacing several parts relating to the brakes, but Hart declined, telling them that he could address those issues himself.

¶ 23       Hart testified that he picked up the motorcycle over a year later, on or about April 6, 2023. He explained that between March 2022 and April 2023, he communicated with MD Racing a few times, both by calling the shop and stopping by. For a long stretch of time—approximately between June 2022 and December 2022 or January 2023—Hart had no communications from MD Racing.

¶ 24 Hart explained that he paid a total of $4,500 for the repairs, including a $1,000 downpayment in May 2022. When he picked up the motorcycle, he used a trailer to take it home because it "was not really ready to be ridden." The motorcycle was still partially disassembled, and Hart needed to replace some parts. MD Racing had drained the fuel from the motorcycle and charged $4 for filling the tank.

¶ 25 Hart testified that he did not ride the motorcycle after transporting it home, deciding instead to have some aesthetic work done, including custom paint. He first rode the motorcycle in "late September, October of 2023," which is when he noticed a problem. Hart explained the problem, as follows:

"I could not accelerate. From a dead stop, I'd had to pull the throttle halfway back to get the RPMs to do anything, to get it to move. Once I got the RPMs up high enough and I was actually able to move the bike and proceed through the gears, it wasn't until, maybe, third gear, at about 4,000, 5,000 RPM that it actually ran partially all right.

The interim between when I picked up the motorcycle from *** MD Racing until I turned it over to Brenny's for repair, I'd ridden the motorcycle four miles. And that's—proof of that is on the odometer reading from the point that I dropped it off at MD Racing and the check-in with Brenny's Motorcycle Clinic. Four miles."

Hart explained that he did not contact MD Racing before he took his motorcycle to Brenny's because he could not tell if MD Racing did quality work, he believed the charges for the repair were excessive, and he thought he got an "unprofessional runaround" when trying to return the lithium battery MD Racing sold him. Later, on cross-examination, Hart acknowledged that he

came into MD Racing and asked for a refund of the battery, which he received in full.

¶ 26    Hart took his motorcycle to Brenny's after he noticed the problem, and they fixed the problem. Hart paid $1,006.55, which he maintained he would not have had to pay had MD Racing performed the initial repairs properly.

¶ 27    Hart then testified about the things on the invoice for which he believed MD Racing excessively charged. He identified a copy of the invoice he received from MD Racing, and the trial court admitted it into evidence. Hart went through the invoice page by page in an attempt to identify (1) the parts and work that were unnecessary and (2) the amount of the excessive charges for those items and services.

¶ 28    On page one of the invoice, Hart asserted he was overcharged $324. 64 for "certain tap screws that are on the invoice, a lot of the [original equipment manufacturer (OEM)] parts that were ordered, particularly the internal parts for the carburetor, the gaskets, throttle cables I included, screws and washers that were unnecessary." However, he did not explain why any of those parts were unnecessary, with the exception of a set of tap screws that he said were "redundant" because he had removed and saved them decades ago.

¶ 29    On page two of the invoice, Hart stated he was excessively charged for motor oil and radiator fluid. He explained that MD Racing used a brand of motor oil that cost $12.95 per quart and that he had never heard of. He claimed that oil was "not something [he] would have ever purchased." Regarding the radiator fluid, Hart said the $26.85 he was charged was unnecessary because he would have added his own radiator fluid and "the only thing that [he] asked MD Racing to do was replace the radiator fill cap." Also on page two, Hart identified a carburetor rebuild kit, for which MD Racing had charged $79. Hart testified that he did not know what the kit was or what it contained. He had "never seen one priced over $35 on eBay," and the

kits on eBay "contain a lot of the similar brass parts that are listed on page 1 [of the invoice]." Hart contended that the repair kit was "[u]nnecessary," "unwarranted, unwanted, and excessive price."

¶ 30         Regarding labor costs, Hart stated he was charged $3,518.42 for 37.43 hours of work. He believed that amount was excessive for three reasons. First, he talked to Yamaha dealers about carburetor rebuilds and cleanings, and none of the estimates he received were greater than $1,500. Second, Brenny's charged him only for about eight hours of labor for the same work. Finally, Hart believed "[a] lot of things in the description here are not noted in the service contract ***. And there was never a modification [of the contract] to do any of this work."

¶ 31         When asked if he believed MD Racing violated or breached its duty under the contract, Hart testified that he believed MD Racing breached the contract by performing work that was not listed and authorized by the contract. Specifically, he testified, "More things were done to the motorcycle, extra work was performed with more hours charged that I didn't want, didn't request." Counsel attempted to clarify by asking, "[A]nd that is the things you just talked about before, correct?" Hart answered, "Yeah."

¶ 32         In addition, Hart testified that he believed MD Racing violated the Automotive Repair Act by failing to note in writing any verbal agreements to add to or alter the terms of the contract, as well as the date and time of the verbal agreement. Hart's counsel quoted the following portion of the Automotive Repair Act (815 ILCS 306/25 (West 2022)):

> "If it is determined that the estimated price is insufficient because of
> unforeseen circumstances, the consumer's consent must be obtained before the
> work estimated is done or parts estimated are supplied. If the consumer's consent

is oral, the motor vehicle repair facility shall make a notation on the work order or estimate and on the invoice of the date, time, name of person authorizing the additional repairs, and telephone number called, if any, together with a specification of the additional parts and labor and the total additional cost."

Counsel asked Hart if section 25 was the section to which he was referring, and Hart answered affirmatively.

¶ 33　　　When asked why he believed MD Racing's work was improper and required Hart to get the motorcycle repaired by another mechanic, Hart stated the following:

"I didn't expect the issues with the running or the performance of the motorcycle to have occurred only after four miles of use. The defendant—or defendant states in his dismissal that he couldn't account for improper use or neglect of the motorcycle. My motorcycle, the day I picked it up from MD Racing, was placed in my garage. I took off the front forks of the motorcycle. I started the engine periodically at least once every week and a half to let the engine run. I couldn't ride it until it was fully reassembled, and that's when I knew that there was another issue with the carbs or something else."

¶ 34　　　Hart reiterated that MD Racing replaced the fuel in his tank because it charged him $4 for fuel. He further testified that between when he picked up his motorcycle in April 2023 and when he rode it in September or October 2023, he "ran the motor quite often." Hart explained that if the motorcycle was going to sit "for any period of time," he would "unplug the fuel pump and let the carburetors burn out," by which he meant he burned all the remaining fuel and dried out the floats to make sure fuel would not sit in the carburetors.

¶ 35　　　On cross-examination, Hart acknowledged that he signed the contract under the

section providing that no written estimate was required and MD Racing would charge $94 per hour. Hart explained that he did not understand the format of the contract and thought his signature was for only one portion of the section and not all of the provisions listed there. Hart also agreed he signed a copy of the invoice, which was then admitted without objection. Hart signed on page four, which contained a long list of recommended services that MD Racing told him needed to be performed but were not because Hart did not agree to the additional services.

¶ 36        Hart testified that he dropped the motorcycle off on March 15, 2022, and on May 18, 2022, he returned to MD Racing to provide a $1,000 cash deposit for the repairs. A copy of the receipt for the deposit was entered into evidence. On further cross-examination, MD Racing asserted to Hart that they would have had a conversation at the time the deposit was paid about what additional repairs or services were going to be performed on the motorcycle, but Hart disagreed with that assertion. Hart stated that the day he dropped off his motorcycle, he asked MD Racing how much it would cost to "get [his motorcycle] cleaned up and get it running again," to which he was told " 'about $1500.' " Hart agreed that he did not make any payments until May 18, 2022, but vehemently denied that they discussed repairs or services at the time he made the deposit. Hart explained as follows:

"You called me on the phone and told me you needed a thousand dollar deposit.

And I said, 'What's this for?'

And I—you didn't state. I came to your location and I paid you a thousand dollars, and I remember asking. You printed out this invoice receipt—or this receipt for the down payment. You didn't state on that down payment what it was for. You didn't cite, as you're supposed to cite, the—the agreement, date and time on that piece of paper which would have sufficed, but you didn't, and there was

- 10 -

no agreement as to what you were going to do to the bike because you had not— as far as I know, you hadn't even evaluated it."

¶ 37          MD Racing asked Hart if he was in the habit of giving random people $1,000 without telling them what to do with the money. Hart answered that MD Racing had his motorcycle, it asked him for a $1,000 down payment, and he paid it. Hart agreed no one forced him to sign the contract.

¶ 38                              2. *MD Racing's Case*

¶ 39                                  a. Cindy Martin

¶ 40          Cindy Martin testified that she had been an automotive technician for the last 48 years. Martin stated, "I have worked on small engines, chain saws, snowmobiles, motorcycles, all of these other things. I have extensive experience of a master technician—a master technician, [ASE] certified for the last 37 years." She was familiar with power sports and motorcycles and had personal experience with "basket case-type restorations."

¶ 41          Martin testified that she had known Hart for more than 10 years, having met him through her husband and her husband's work. She saw Hart's motorcycle when he dropped it off at MD Racing and described the condition of the motorcycle as follows: "It was in a disassembled state, status, where it was not running, and it needed extensive work." Martin said the motorcycle "[a]bsolutely" qualified as a "basket case." Martin reviewed the invoice from MD Racing for the repairs and agreed that "it was a fair and reasonable assessment" of the work necessary to get the motorcycle running. Martin was asked to give her opinion on whether anything was overcharged or unnecessary, and she stated the OEM parts were needed for long term performance and the racing oil used was billed at a fair price. She believed the 37 hours of labor was likely shorter than the amount of time actually spent on the repairs. Martin also opined

that the various service checks and tests performed were standard, all related to making sure the motor was working properly, and were necessary to verify that the carburetor repairs were valid.

¶ 42 Martin testified that she spoke with Hart about the motorcycle on a couple of occasions. Hart had asked Martin to work on it, but Martin referred him to MD Racing because Drucker was more qualified to do the work it needed. Martin said she spoke with Hart once after the repairs and questioned why Hart took it to Brenny's instead of back to MD Racing to give it the opportunity to "make it right." Drucker asked, "Did he tell you how he stored the motorcycle?" and Martin answered as follows:

> "He told me that he had just parked it and took it apart for other painting reasons, and I did not hear anything about him starting it and running it at any point in that time. And I do know that fuel will degrade over certain amount of time. It can go, like as the other technician said, could be just a couple weeks, and even if you had put fresh fuel in it, anything residual in the lines will also cause problems. I've seen that from the pictures that were presented. That is a degraded fuel. That's bacteria in the fuel system that is hard to get out of a tank, and it can come back without getting a decent stabilizer in there, and who knows what he put in it."

¶ 43 On cross-examination, Martin testified that she did not actually work on the motorcycle. When asked why MD Racing spent 30 more hours working on the motorcycle than Brenny's, Marin answered, "Because [MD Racing] had already completed the work. Bolts were freed up, things were replaced, time wasn't spen[t] on ordering parts or doing any research." Martin stated that "[i]t can be" typical in the industry for a motorcycle to spend 13 months in a shop for these sorts of repairs.

¶ 44        On redirect examination, the following exchange occurred:

"Q. So, basically, you're saying that since I did all the heavy lifting with the carbs, getting it ready to go, it was much easier for the next guy to work on, which it seemed to indicate that he's found no defects of workmanship according to his statement, so it was a lot easier for him to get his job done because all the heavy lifting was done by MD Racing. Is that a fair and accurate statement?

A. Yes."

¶ 45                                    b. Matt Drucker

¶ 46        Drucker testified that his repair shop, MD Racing, performed "oil changes and tire changes," but it also performed more time consuming projects, such as "engine builds, tuning, [and] full restorations." Because the nature of this work required MD Racing to "cover [its] liability," it used a contract for service that "clearly states what's warrantied, what's not, and what we're going to cover and do." Drucker stated that MD Racing never did work that was not authorized by the customer.

¶ 47        Drucker reiterated that Hart signed the contract, including on the line that said he did not require a written estimate, and he initialed the second page of the contract. Drucker stated he was not given "the opportunity to do a good will on it," meaning that had Hart brought the motorcycle back and said something was wrong, MD Racing would have likely done extra work at no charge to fix the issue. However, he never heard from Hart, and "the whole thing was a little bit of a shock when [he] got the summons."

¶ 48        Drucker testified that Hart came into the shop and talked with him on a few occasions. Drucker then said Hart made two different payments, one on April 3 and the other on April 6 when he paid off the balance owed, "and at no time did he have a complaint or problem

with the bill or what he paid." Drucker further stated that he personally drove the motorcycle on a test drive and it drove fine. Even though Hart did not ride the motorcycle and took it home on a trailer, Drucker said the motorcycle was rideable and "ran great," although it still needed additional maintenance.

¶ 49 Drucker testified that he was unclear what exactly Hart was disputing regarding the parts that were billed and whether Hart was disputing that they were purchased or if he was disputing how much MD Racing charged. Drucker offered "a copy of what full retail is on the parts versus what I charge, because my total of the parts came up to $540 where a full retail for the parts was $726." Drucker also offered a copy of what he charged and "a highlighted annotation of what [he] charged for the original equipment parts and what full retail is." The trial court admitted those exhibits without objection. Drucker testified that the retail price could also be confirmed by looking at the Brenny's invoice, which charged the same retail price on a couple of the parts. Based on this comparison, Drucker asserted that Hart received "a heavily discounted price."

¶ 50 On cross-examination, the following exchange occurred:

"Q. All right. And then the contract does provide that any alterations were to be made in writing, correct?

A. It—while it does say that there, Illinois law does allow for oral additions even if the contract precludes oral modifications.

Q. And do you—did you take down the leave [*sic*] the required information about date, time, phone number, call for authorization, these oral modifications?

A. Sadly, I don't have that documentation here.

Q. In your opinion, do you owe any money to the plaintiff?

A. That's not really a fair question. I don't think so. It's just I don't even know what we're doing here. I think that's a better answer."

¶ 51                                    3. *The Trial Court's Ruling*

¶ 52        After MD Racing rested, the trial court ordered the parties to submit written closing arguments, which they did.

¶ 53        Later in February 2025, the trial court issued a written ruling by docket entry, stating as follows:

"The Court after holding trial, hearing all witnesses, reviewing exhibits and relevant case law and or statutory provisions, and after reviewing written arguments finds as follows; The Court does find all witnesses to be credible in this case. However, the Court from all the evidence provided cannot determine by a preponderance of the evidence that the defendant was at fault for damages incurred in this case. The Court notes the LONG period of time between the original service, and the repairs. The Court also notes plaintiff didn't ask defendant about the work done if he felt it wasn't done up to standards. Most people would generally take it back and inform the person the work wasn't done or at least have some type of conversation with the other party about the workmanship. The Court isn't saying the defendant is innocent, the Court is saying the plaintiff did not meet his burden of proof in this case, so the Court finds in favor of the defendant."

¶ 54        This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56    Hart appeals, arguing the trial court erred by (1) not considering various provisions of the Automotive Repair Act (815 ILCS 306/1 *et seq.* (West 2022)) and (2) finding he did not meet his burden of proof where he showed MD Racing performed repairs that were not listed in the contract and overcharged for those repairs. We disagree and affirm.

¶ 57                              A. The Automotive Repair Act

¶ 58    As an initial matter, we note that Hart's claims regarding the Automotive Repair Act (Act) are misplaced because that Act does not apply in this case. Specifically, the Automotive Repair Act does not provide a private right of action to consumers for violations. See *Jandeska v. Prairie International Trucks, Inc.*, 383 Ill. App. 3d 396, 400 (2008) (noting that "providing a private right of action is not necessary to provide an adequate remedy for violation of the statute as section 85 of the Automotive Repair Act provides penalties for violations of the Act"). Instead, section 85 of that Act authorizes the "Attorney General and the several State's Attorneys" to enforce the Act under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2022)) "[i]n the case of *** a knowing, persistent practice of pattern of conduct" that violates the Act. 815 ILCS 306/85 (West 2022). We also note that section 75 of the Automotive Repair Act provides that repair facilities that fail to comply with the Act are "barred from asserting a possessory or chattel lien for the amount of the unauthorized parts or labor upon the motor vehicle or component." *Id.* § 75. Given this context showing the Automotive Repair Act contains limited and specific statutory remedies, we conclude that Hart cannot rely on the provisions of that Act to support his claims.

¶ 59    Even if we were to consider Hart's claims under the Act, for the reasons explained hereafter, we conclude that the trial court's finding that Hart failed to meet his burden of proof was correct and affirm the court's judgment.

¶ 60                            B. The Breach of Contract Claim

¶ 61                                  1. *The Applicable Law*

¶ 62          "In order prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, (2) the performance of the conditions precedent, (3) breach by defendant, and (4) damages as result of the breach." *Nelson v. Quarles & Brady, LLP*, 2018 IL App (1st) 171653, ¶ 143. "Plaintiffs must prove a breach of contract cause of action by a preponderance of the evidence." *Lidecker v. Kendall College*, 194 Ill. App. 3d 309, 317 (1990). A plaintiff must meet its burden of proof with respect to each element of its claim. *Redmond v. Socha*, 216 Ill. 2d 622, 644 (2005). "Whether a breach of contract occurred *** is a question of fact, and the court's finding will not be disturbed on appeal unless it was against the manifest weight of the evidence." *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 24.

¶ 63          "A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence, or when an opposite conclusion is apparent." *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23. "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59. The appellate court therefore does not substitute its judgment for that of the trial court and will not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact. *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 38. Accordingly, the trial court's judgment will be affirmed provided the record contains any evidence supporting it. *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010).

¶ 64        "Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68.

¶ 65                                    2. *This Case*

¶ 66        Here, the trial court explicitly stated that it found all witnesses to be credible and, after considering all the evidence presented, concluded that Hart had failed to prove his case by a preponderance of the evidence. The court emphasized that it was not concluding that MD Racing was "innocent" and instead was basing its finding on Hart's failure to meet his burden of proof "that [MD Racing] was at fault for damages." In other words, after hearing all the evidence, the court was not convinced that it was more likely than not that MD Racing's actions caused Hart to either (1) overpay for the repairs or (2) pay Brenny's to clean the carburetors.

¶ 67        In particular, the trial court highlighted some of the questions that remained after considering all the evidence at trial, such as (1) the long time period between MD Racing's service and Brenny's repairs and (2) Hart's failure to follow up with MD Racing about the quality of repairs. These two questions suggest Hart may have been at fault for the further repairs by not properly storing or maintaining the motorcycle and may have considered MD Racing's workmanship to be acceptable and changed his mind only after paying Brenny's for repairs.

¶ 68        The evidence in the record supports the trial court's findings. Both Babb and Martin testified that, based on their extensive experience, carburetors could go bad within a few weeks, depending on the fuel. Babb stated that he did not see any indicia of poor workmanship prior to repairing the motorcycle. MD Racing presented an estimate sheet showing the online prices for the parts, which ended up costing more than the amount Hart was charged and paid.

Indeed, some of the parts were priced slightly cheaper than what Brenny's charged. And Martin opined that MD Racing's charges for the cost of the parts were fair or even a little low. Martin also opined that the labor costs were reasonable.

¶ 69        Finally, Hart paid the invoice in full and never complained about the amounts charged or the services performed until after he got repairs at Brenny's, and this occurred despite his returning the new battery and receiving a full refund. Common experience suggests that a customer would notice when charged for unauthorized work or overpriced or unnecessary parts and seek a refund from the seller, as Hart did with the battery. Hart's failure to do so here suggests that Hart had, in fact, agreed to all of the services MD Racing performed, whether under the original contract or through a subsequent oral modification during one of the several meetings and phone calls the parties agreed occurred.

¶ 70        By highlighting this evidence, we are not suggesting that Hart failed to present *any* evidence in his favor. To the contrary, the trial court could have believed Hart's need to have identical services performed on the exact same parts at a drastically lower cost suggested that MD Racing may not have provided workmanlike service or overcharged in some respect. However, that evidence does not compel a finding in Hart's favor, particularly considering that Hart stored the motorcycle for six months after paying MD Racing for the repairs, and during that time, the lack of use could have led to the carburetors needing further cleaning or repairs. Our point is that given all the conflicting evidence and the trial court's finding that all witnesses were credible, the court's conclusion that Hart failed to meet his burden of proving MD Racing was at fault by a preponderance of the evidence is well supported by the record. Accordingly, we affirm the trial court's judgment against Hart.

¶ 71        In closing, we express our gratitude to the trial court, whose careful consideration of the evidence and thoughtful written ruling identifying whom it found credible greatly assisted our review.

¶ 72                                    III. CONCLUSION

¶ 73        For the reasons stated, we affirm the trial court's judgment.

¶ 74        Affirmed.